PROVOSTY, J.
On the 19th of March, 1909, the parties to this suit entered into a contract by which the plaintiff sold to the defendant one-half million feet of pine at $7 per thousand and 2,000,000 feet of oak at $9 per thousand. The pine logs were to be delivered in rafts in the Ouachita river at the mill of the defendant, and were to be paid for $3,000 cash, $3,000 in 60 days, and the balance of $4,500 in five months. For the deferred payments, notes were to be given. The oak logs were to be delivered on the banks of the Ouachita river and Bayou *962 D’Arbonne at the rate of 400,000 feet per month. The contract specified that they were to be of “Cow Oak, Forked Leaf White Oak, and Overcup Oak.”
The defendant company’s sawmill, as the name of the company indicates, is a hardwood mill; that is to say, is designed to cut hardwood, not pine. And, in view of that fact, the defendant was not anxious to have the pine logs, but took them simply in order to have the oak. As a matter of fact, the defendant company, after sawing a considerable part of this pine timber, found that it was doing so at a loss, and concluded to sell the remainder.
By verbal agreement, the two notes for $3,000 and $4,500, respectively, called for by the contract, were not executed and delivered at the date of the contract, but were to be given later. This was for the accommodation of the defendant company, which did not desire to have it appear in the reports of the commercial agencies that it had given notes, as it was supposed to be doing business on a cash basis. No exact date seems to have been fixed by the verbal agreement for the execution and delivery of the notes.
Nearly two months passed without the notes having been delivered, and without the plaintiff, on his part, having made any delivery of oak logs. By that time, the parties seem to have been mutually pressing — ■ the plaintiff for the notes, and the defendant for the delivery of the oak timber. A few days before the expiration of the 60 days when the first note was to have been payable, the defendant executed and tendered the two notes to the plaintiff, but with the following clause added to the $4,500 note, to wit:
“The payment of this note is conditioned on the performance of the contract between us of March 19, 1909.”
Plaintiff at first refused to accept the note with this clause in it, but finally consented to do so.
Defendant says that this clause was thus inserted in view of the failure of the plaintiff thus far to have complied with his con-; tract. The note of $3,000 was paid by defendant at the time the plaintiff consented to accept the $4,500 note; its maturity being thus anticipated by some seven or eight days.
A few days thereafter, namely, May 19, 1909, the defendant wrote a letter to plaintiff making peremptory demand for the delivery of the oak logs as per contract, or, in other words, putting plaintiff in default. By a letter dated on the same day, May 19th, but mailed later, the plaintiff answered that he had something over 400,000 feet of logs on the banks of the Ouachita river and D’Arbonne bayou ready for delivery. Defendant inspected this timber and found it to be-“post oak, pine oak, and red oak,” and not “Oow Oak, Forked Leaf White Oak, and Overcup Oak,” as called for by the contract. Plaintiff, however, testifies that some 15 per cent, of it was of the kind called for by the contract. For want of better, the defendant consented to make a trial of this timber, and, accordingly, took approximately three barge loads of it, or about 63,000 feet, to see if the same could be utilized. The timber proved unsatisfactory, and defendant notified plaintiff that it would not receive any more of the same kind, but would insist that plaintiff deliver the kind of timber called for by the contract. In the meantime, the plaintiff had continued to put logs of the same unsatisfactory character on the river bank for delivery to defendant. After several interviews and a good deal of discussion, the parties agreed to inspect and scale the logs on the river bank, as a provisional measure, with a view to some adjustment of their differences. As the result of this inspection and sealing, 247 logs, aggregating 76,166 feet, were found to come up to the requirements of the contract, and were marked with a blue pencil for future identification; about *964 100 were found to be simply worthless; 731, aggregating 177,364 feet, were found good, though not of the character called for by the contract, and were marked with plaintiff’s brand for identification. After further disagreement and discussion, the parties finally came to a compromise, by which, in full settlement of the whole business transaction between them, the defendant was to take all the timber that had been scaled and marked and pay the plaintiff $1,828 in cash, together with the $4,500 note. A written instrument of compromise was drawn up to witness the compromise. Defendant paid the $1,828 cash. But, when defendant went to take the timber, differences again arose. Plaintiff objected to the defendant’s taking that part of the timber which was below a point called Daily’s Woodyard, contending that the timber sold was only that part of the timber which was above Daily’s Wood-yard. The instrument evidencing the compromise did in fact read as thus contended by plaintiff; but it had not been made to express the true agreement of the parties. It read:
“All the hardwood timber now lying and situated on the Ouachita river at and between Daily’s Woodyard and Buffalo Landing aggregating 257,000 feet, more or less.”
The president of the defendant company had signed the document assuming that the points mentioned designated correctly the location of the timber which had been scaled and marked and was proposed to be included in the compromise agreement. Defendant was desirous of carrying out the compromise and made every effort in vain to induce the plaintiff to correct the written instrument so as to make it express the true agreement of the parties. Meantime the maturity of the $4,500 note was approaching. Defendant deposited in bank an amount sufficient to pay the note, but would not make the payment unless the plaintiff agreed to correct the instrument of compromise so as to include all the timber that had been scaled and marked. Defendant offered to let the money remain in escrow for the payment of the note, subject to the correction of the instrument evidencing the compromise. The bank in whose hands the plaintiff placed the $4,-500 note for collection caused it to be protested on the day it fell due (a ceremony altogether useless so far as conserving the rights of the plaintiff was concerned, but of a nature to damage seriously the credit of the defendant company); and five days thereafter plaintiff filed this suit.
The suit, as originally filed, was a plain suit on the $4,500 note. On the next day after its filing, however, the plaintiff, by supplemental petition, obtained writs of sequestration and attachment, on the usual allegations, and on the allegation that the defendant company was a Kentucky corporation having its domicile in that state and a nonresident of Louisiana.
Under the writ of sequestration, the sheriff seized 500,000 feet of .logs — part of the pine logs that had been sold by plaintiff to defendant; and under the attachment he seized the sawmill plant of the defendant, some $16,000 of lumber at the mill, and the sum of $4,909.32 on deposit to the credit of defendant in one of the local banks; in fact, all of plaintiff’s property in Ouachita Parish'. The defendant promptly procured the release of these seizures on forthcoming bond.
Defendant’s contention is that the note was conditional upon the execution of the contract for the delivery of the oak timber, and that, this contract not having yet been fulfilled, the note is not exigible. Defendant’s prayer is that the suit be dismissed, and the writs of sequestration and attachment dissolved, and that the plaintiff be condemned to pay the damages caused by the wrongful issuance of said writs, which are stated to be as follows: $500 for attorney’s *966 fees in procuring the release of the seizures on bond; $1,000 for the trouble, annoyances, and injury to defendant in having its business interrupted, its mill closed up, and its labor and employés thrown out of work, disorganized, and demoralized; $5,000 for injury to its credit, reputation, and financial' standing by having its business closed up under writs; and $10,000 exemplary damages, plaintiff having acted through malice.
The first contention of the plaintiff is that the $4,500 note was given for the purchase price of the pine logs, which admittedly were delivered to the defendant company; that it is therefore due; and that this suit, consequently, is nothing more than a plain suit upon a promissory note, accompanied by sequestration to enforce the vendor’s privilege securing the payment of the note, and by attachment for subjecting the defendant, a nonresident, to the jurisdiction of the court. In other words, that this $4,500 note is to be disconnected entirely from that part of the contract having reference to the oak timber, and is to be considered to be an absolute and unconditional promise to pay the amount it calls for.
Plaintiff’s second contention is that the contract of March 19, 1909, was subsequently changed by verbal agreement so as to allow the plaintiff the right to deliver the kinds of oak he was offering to deliver, instead of the particular kinds specified in the contract.
Finally, plaintiff contends that the written instrument of compromise correctly expresses the agreement of the parties; that the agreement was that the defendant should have, not all the timber on the river bank which the parties had scaled and marked, but only that part of it above Daily’s Wood-yard.
The first of these contentions is answered by the plain statement on the face of the note, namely, that:
“The payment of this note is conditioned on the performance of the contract of 19th March, 1909.”
Plaintiff consented to accept the note as thus written, and is bound by such consent. Plaintiff’s learned counsel argue that inasmuch as the note which the defendant was bound, under the contract, to deliver, was to be unconditional, and inasmuch as the note sued on was given in pursuance of the contract, the insertion of said condition in the note was unauthorized, and said condition must be considered as not written. We do not agree with that view. When the note came to be executed, matters had progressed. Plaintiff had failed to deliver the 400,-000 feet of oak per month, and defendant was entirely justified in taking the precautionary measure of adding this clause to the note. Furthermore, it is not true that the sale of the pine timber was a separate transaction or contract from the sale of the oak, so that this note must be disconnected from the oak part of the contract.- The contract was a whole; the timber was sold as a whole. The president of the defendant company testified, and is uncontradicted, and the circumstances corroborate him, and we believe him, that the main object of the contract was to secure the oak; the pine being taken along merely as an unavoidable incumbrance.
Passing to the next contention of plaintiff, that the contract was changed verbally so as to allow the delivery of oaks different from those specified in the contract, wé find no proof of this in the record. Counsel find such proof in a certain conversation had with Mr. Houston representing the defendant company. But plaintiff himself, on cross-examination, when asked: “When was that conversation?” answered: “Just before we signed the contract. Q. Of March 19th? A. Yes, sir.” A conversation antedating the contract, it is needless to say, cannot have *968 modified the contract. The defendant company’s president did inspect the timber that was already on the river bank and agreed to make a trial of it; but, as already stated, the trial proved unsatisfactory.
Upon the third and last of the above-mentioned three contentions of defendant, that the- written instrument of compromise expresses correctly the agreement of the parties, the evidence is simply overwhelmingly against plaintiff. We do not know that any useful purpose would be subserved by going into it to any great length. The proposals and counter proposals which culminated in the compromise agreement all called for the timber that the parties had inspected and scaled. The said inspection and scalage was had with a view to future attempts at adjustment. Even the whole of said timber was but a very small part of the 2,000,000 feet which the plaintiff was under contract to deliver. The defendant was desirous of getting as much timber as possible, and we must assume that the plaintiff was willing to fulfill his contract at least to the extent of letting the defendant have the timber that was already on the river bank, put there for the purpose of fulfilling the contract. There is every reason to believe that the whole of the timber inspected, scaled, and marked was intended to be included in the agreement, and absolutely no reason whatever for supposing the contrary. Besides, the positive testimony of the two attorneys, who were representing the two parties in the transaction and were present at all the conversations and conducted most of them, leaves no doubt whatever on the subject. The testimony of plaintiff to the contrary is in itself very unsatisfactory.
The defendant must be held to be entitled to the delivery of all the timber that was scaled and marked by the parties on the occasion in question, whether situated below or above Daily’s Woodyard; and the note sued on must be held to be conditioned upon plaintiff’s performance of his contract by the delivery of this timber, and consequently not to be yet due, the timber not having yet been delivered.
As the result of this finding, the writs of attachment and sequestration must be held to have been issued prematurely and wrongfully, and plaintiff must be held responsible for the damages caused by same to the defendant company.
The learned trial judge found that the instrument of compromise should be corrected so as to include all the timber that had been scaled and marked; but gave judgment, nevertheless, for plaintiff, on the theory, as we gather from the argument of counsel, that, by an express clause of the instrument of compromise, the $4,500 note was to remain unaffected by the compromise, and was to be paid at maturity. The clause in question reads:
“It is specially agreed that this instrument does not affect in any wise the obligation to pay the note of $4,500, which matures August 10, 1909; but that the same is to be promptly paid at its maturity.”
But that clause was necessarily conditional upon plaintiff’s fulfilling his part of the agreement of compromise. The respective stipulations of a contract are interdependent. Plaintiff cannot pretend to hold defendant to its part of the agreement while he himself is refusing to perform his part. We note, in passing, that the above-quoted clause says the very opposite of what it means to say. The meaning is, not that the $4,500 note is not to be affected by the compromise, but that it is to be affected by the compromise ; that, whereas, theretofore it had been conditional upon the fulfillment of the contract of March 19, 1909, it is now, as an effect of the compromise, to be no longer so, but to become an unconditional obligation. But, needless to add, it was to be thus changed only in case the compromise which effect *970 ed this change was carried out by the plaintiff. The condition that the contract will be carried out is necessarily inherent in every clause of every contract.
The sequestration of the pine logs was predicated on the fact that the defendant company was proposing to sell them. This would have been good ground for sequestration, had the debt been due, and had not the circumstances been such that the plaintiff could not but have known that a sequestration was utterly unnecessary.
All of the property of the defendant company was situated in the parish where the plaintiff lived and in a neighboring parish. Plaintiff was familiar with this property. It consisted of the sawmill plant worth at least $50,000; some $10,000 of lumber at the mill; about half a million feet of the pine logs bought from plaintiff; two machines at the sawmill, a loader, and a skidder, worth about $15,000; 14,000 acres of land, worth, defendant’s president testifies, about $10 per acre, though the price appearing of record was $104,000. The plaintiff testifies he was familiar with these lands, and that they were worth a great deal less than $10 per acre. The defendant company had, in addition, the $4,909.32 cash, in bank. The total debts of the defendant amounted to $86,000.
It was after the $4,909.32, cash in bank, had been attached, that the rest of the property was attached and sequestered. True, the attorney who directed the seizure for plaintiff testifies that, at the time the seizures were made, he had no knowledge of what amount of money the defendant company had on deposit in bank, subject to the garnishment. But the garnishment was made in the city of Monroe, the parish seat, where plaintiff’s attorney was at the time, and the other seizures were made only some two hours later at the sawmill outside of the city. There is no reason to suppose that inquiry at the bank would not have procured for plaintiff’s attorney information as to the amount covered by the garnishment. If the consent of defendant’s president had been necessary for giving the information, such consent could have been easily obtained. All the parties were in telephone communication with each other. When the deputy sheriff came to levy upon the mill plant, etc., defendant’s president protested against any further seizures, on the ground that sufficient property had already been seized under the garnishment to satisfy any judgment that could possibly be rendered in the case. He also pointed out the two machines, the skidder and the loader, as being property whereof the seizure would cause no damage and no great inconvenience, and amply sufficient to satisfy any judgment that could possibly be rendered; the two machines being new and worth about $15,000. In view of these protests, the deputy sheriff, before making the seizure, communicated by phone with the plaintiff’s counsel, and suggested that the two machines would be sufficient property to seize. Counsel gave positive instructions to seize everything. The recklessness of these seizures shows an intention to oppress the defendant company, and there is also evidence going to show express malice on the part of plaintiff.
The $500 of damages for attorney’s fees is proved and must be allowed.
The actual damages suffered from the attachment as the result of the disturbance to defendant’s business and the injury1 to its credit cannot be fixed with any certainty. This, however, is no reason why no damages at all should be allowed, when, most unquestionably, some damages were suffered. A sawmill concern like defendant’s cannot be attached in this way without some damage being suffered, and an attachment is necessarily injurious to credit. In such cases the courts are bound to fix the damages as best they can, approximating the loss. Byrne v. Gardner, 33 La. Ann. 6; also, Dirmeyer v. O’Hern, 39 La. Ann. 963, 3 South. 132; Tis *972 sot v. Great Southern Tel. Co., 39 La. Ann. 1005, 3 South. 261; Chapuis v. Waterman, 34 La. Ann. 60. We fix these actual damages at $500.
We think this is a ease for punitory damages, and fix them at $500.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that this suit be dismissed, and that the plaintiff pay the costs of this suit, and that defendant, the I-Iardwood Manufacturing Company, have judgment against the plaintiff, S. E. Wall, for the sum of $1,500, with 5 per cent, interest per annum thereon from this date.