Syllabus by the Court.
A foetus en ventre sa mere in the ninth month of gestation is a child in contemplation of law and within the meaning of Article 2315 R.C.C., which confers upon parents a right of action for the loss of a child by the negligent act of another.
A prenatal injury of a foetus in the ninth month of gestation which results in the death of the child three days after its birth, gives the child a right of action against one whose negligence caused the injury which survives to its parents under Article 2315, R.C.C.
The exercise of judicial discretion in the estimation of damages due to deprivation of parentage, presents less difficulty than is involved in appraising the value of mental anguish, the loss of intellectual or aesthetic enjoyment or other forms of moral injury which our Courts are constantly called upon to assess.
The fact that a child dies three days after its birth from injuries received prenatally, does not justify the conclusion that it was incapable of suffering.
This is an action ex delicto under Article 2315, Revised Civil Code. The plaintiffs, Mr. and Mrs. Cooper, allege that they were tenants of the defendant under a written lease, occupying the premises No. 1642 Elysian Fields Street, in this City, belonging to the defendant; that during the term of their lease Mrs. Cooper while lying in bed in the leased premises was injured by falling plaster from the ceiling of the bed room, striking her in the abdomen causing her to suffer great pain and anguish and causing the premature birth of a child with which Mrs. Cooper was then pregnant some eight months. The child lived several days and it is alleged died as a result of the prenatal injuries inflicted upon it by the falling plaster. Mrs. Cooper sues for damages in the sum of $5,000 as compensation for the pain and suffering she experienced and Mr. and Mrs. Cooper sue (a) "for the suffering endured by their said child previous to its death" and (b) "for the mental anguish, suffering and pain caused to them by the death of their child" in the sum of $10,000.
An exception of no cause of action was filed by defendant and prior to the hearing of the exception plaintiffs filed a supplemental petition, in which the claim asserted on the part of the husband and wife jointly is further elaborated by the following allegation "that at the time Mrs. Cooper was injured she had been pregnant for eight months; that the falling of the plastering on her stomach caused the subsequent death of her said child; and that she and her husband suffered as damages through the loss of said child, the companionship, support, love and affection which they had the right to expect from said child."
Upon the trial of the exceptions the judge a quo held that there was a cause of action as to the claim of the mother for *Page 354 
injuries sustained by her and overruled the exception to this extent, but that as to the claim of the father and mother jointly, there was no cause of action and maintained the exception to that extent.
From this ruling of the Court the plaintiffs have appealed and there is therefore before us for consideration the question of the right of the father and mother to recover under Article 2315 of the Revised Civil Code for (a) the suffering caused their deceased child as having survived to them and (b) for the death of their said child as having been conferred upon them directly under the terms of the Article.
It is to be observed that Article 2315, Revised Civil Code confers upon parents two distinct causes of action for the death of their children. They may sue for the suffering experienced by the child or in other words such action as the child itself might have brought had it survived the injuries which caused its death, and they may sue for the loss of the companionship, affection, support and comfort and other joys and satisfaction incident to parentage of which they have been deprived. The latter cause of action was conferred upon them by an amendment of the codal provision in 1884, as strangely enough the law previously had refused to put a value upon human life.
Justice Manning in the case of Van Amburg v. Railroad Company, 37 La. Ann. 650, 651, 55 Am.Rep. 517, in referring to the Act of 1884, observed: "The second item of damage cannot be considered. Legislation and jurisprudence have combined to perpetuate the extraordinary doctrine that the life of a free man cannot be made the subject of valuation, and under the domination of that dogmatic utterance, made earlier than the Roman Digest, reproduced therein, and echoed by the courts of all countries from then till now, the singular spectacle has been witnessed of courts sanctioning damages for short-lived pains and refusing them for a long-life sorrow and the pecuniary losses consequent upon the death of one from whom was derived support, comfort and even the necessary stays of life. Legislation has at last come to the relief of future sufferers. The act of 1884 applies the remedy that the public conscience has long remanded, but it has missed application to this case only by a few days."
So far as the present case is concerned the two causes of action are closely related, perhaps inseparably so, and we will discuss them together.
If the child had been injured subsequent to its birth, no matter how soon thereafter, and had died from the effects of such injury, no matter how short its span of life, there could be no doubt that its parents could have maintained an action against the party responsible for its injury, and in view of the writer of this opinion, at least such action might be based upon the damages done the child, the right of action for which survived to the parents, as well as the damages to themselves as parents because of the death of their child.
The question for consideration here is therefore whether the fact that the injury was inflicted prenatally alters the situation. In other words, when, in contemplation of law, does life begin. Is it at the time of conception of the mother, as an ovum or at a more advanced stage of pregnancy, as an embryo, or when nearing the final stage of pregnancy as a foetus or only when physically separated from the mother by birth.
Considered from a physiological standpoint the stage of pregnancy at which the foetus may be said to be viable, has not been definitely established.
In Wharton Stille's Medical Jurisprudence, Vol. 3, at page 35, Chapter 63, we find the following: "As to the early limit of pregnancy, we have again two points to consider: The first, as to what is meant by being born alive, and the second, as to viability. To the medical man the fetus still unborn is alive, so that an abortion at any period might produce a live fetus. From a legal point of view, if we take voluntary or reflex independent motion as a criterion of life, there is nothing much more definite to guide us."
The Author then quotes from Berthod: Wharton Stille's Medical Jurisprudence, Vol. 3, at page 35.
" 'Dans certains cas les embryons ou les foetus expulses par avortement donnet des signes evident de vie et si par hazard l'oeuf est reste intact, on les voit s'agiter *Page 355 
dans le liquide amniotique; nous avons meme recueillis une observation de ce genre dans un cas de grossesse gemellaire. Les foetus de quatre mois restent quelquefois plus d'une demiheure sans respirer; on peut alors suivre facilement les battements du coeur et ceux-ci se ralentissent des que le foetus se refroidit, ils s'accelerent quand on le rechauffe. Aussi lorsque ces foetus sont menaces d'une mort imminent par suite de refroidissement qui les envahit, on peut les ranimer et prolonguer leur vie en les plongeant dans un tasse d'eau a la temperature de 37-40 C., ainsi que nous avons en plusieurs fois l'occasion de le faire.
" 'Au cinquieme mois les enfants respirent, mais d'une facon si incomplete qu'ils ne tardent pas a succomber. A la fin du sixieme mois la respiration s'etablit et les enfants peuvent vivre pendant plusieurs heurs et meme plusieurs jours.' "
From the same authority we give the following interesting account of a child prematurely born as a result of the mother's miscarriage 144 days after conception, or less than five calendar months. " 'It breathed with a kind of convulsive gasp at intervals of one or two minutes. The heart beat regularly for forty-five minutes. The child repeatedly opened its mouth, and thrust forward its tongue.' It measured (it was a female) ten inches in length, and weighed fourteen ounces. The integuments were, for the most part, firm, and of a light color; the portion covering the abdomen was thin and of a reddish hue. The hair of the head was like down, the rudiments of the nails were plainly discernible, and the iris was entirely closed with the membrana pupillaris. The head was tolerably firm, but the frontal and the parietal bones were imperfect and widely separated. Dating from the first intercourse after the previous miscarriage, the age of the child was 144 days, or less than five calendar months." (Wharton Stille's Medical Jurisprudence, Vol. 3, at page 36.)
While the earliest period at which a foetus may be said to be viable, is still a matter of considerable doubt, the medical authorities expressing the opinion that the controlling factor is the weight of the embryo, the fact that the foetus is in an advanced stage of pregnancy, viable and in fact possessed of prenatal life is indisputable.
"That infants born one or two months before term have been reared to adult life is doubted by no one. And with the introduction of artificial feeding and warmth, the age of viability has been lowered remarkably in the last few decades. Berthod, in his thesis to the University of Paris in 1885 (Les Enfants nes avant Terme. La Conveuse et law Gavage), gives the following table:
 "Months of Number of Per Cent Alive
 "Intrauterine Cases Born. on Discharge
 "Life. from Hospital.
 "6 14 30
 "6.5 34 53
 "7 77 63.7
 "7.5 84 78.7
 "8 177 85.9
 "8.5 107 91.6"

Wharton Stille's Medical Jurisprudence, Vol. 3, p. 38)
From the foregoing table it appears that infants who for one reason or another have been forced to make their appearance in the world before the time which nature, in its wisdom, appointed, have been reared to adult life and that beginning with the sixth month of pregnancy, where according to the authority we have just quoted, the percentage is thirty, each day of gestation thereafter increases the chances for life until the final stage of normal gestation, when 91 6/10 per cent. of infants prematurely born have the same chance of normal life as an infant normally born.
The law from the earliest times recognizes a distinction between offences committed against a living child en ventre sa mere and the embryo of a child which has not attained the stage of development at which it could be said to be living. The biblical expression "quick" as meaning "alive" or "living" is used by the earlier writers. "And he commanded us to preach unto the people and to testify that it is he which was ordained of God to be Judge of quick and dead." (Acts 10-42)
In State v. Cooper, 22 N.J.L. 52, 51 Am. Dec. 248, the learned author of the opinion thus reviews the ancient common law. 22 N.J.L. pages 54, 55:
"There appears to be at the common law a distinction equally well settled between *Page 356 
the condition of the child before and after the mother is quick. "Life," says Blackstone, 'begins in contemplation of law as soon as an infant is able to stir in the mother's womb.' 1 Bl.Com. 129.
"It is not material whether, speaking with physiological accuracy, life may be said to commence at the moment of quickening, or at the moment of conception, or at some intervening period. In contemplation of law life commences at the moment of quickening, at that moment when the embryo gives the first physical proof of life, no matter when it first received it.
"The offence of procuring an abortion seems, by the ancient common law writers, to be treated only as an offense against life. Thus Coke says, 'If a woman be quick with child, and by a potion or otherwise killeth it in her womb, or if a man beat her whereby the child dieth in her body, and she is delivered, this is a great misprision, but no murder.' 3 Inst. 50. It was anciently holden that the causing of an abortion by giving a potion to, or striking a woman big with child, was murder; but at this day it is said to be a great misprision only, and not murder, unless the child be born alive, and die thereof. 1 Hawk.B. 1. c. 31, sec. 16.
"If a woman be quick or great with child, if she take, or another give her any potion to make an abortion, or if a man strike her, whereby the child within her is killed, it is not murder nor manslaughter by the law of England, because it is not yet in rerum naturae, though it be a great crime, 1 Hale's P.C. 433. If a woman be quick with child, and by a potion or otherwise killeth it in her womb, or if any one beat her whereby the child dieth in her body, and she is delivered of a dead child, this, though not murder, was by the ancient law homicide or manslaughter. But the modern law doth not look upon this offence in quite so atrocious a light, but merely as a heinous misdemeanor. 1 Bl.Com. 129.
"In two of these authorities (Hale and Hawkins) the term 'big' or 'great' is obviously used as tantamount to 'quick'. In all of them, the authors are treating of the crime of murder, of the offence against human life; and they distinguish between the destruction of the life of the infant before and after birth. There is in none of them a reference to the mere procuring of an abortion by the destruction of a foetus unquickened, as a crime against the person or against God and religion."
We quote from an early statute, Revised Statutes of 1829 of the State of New York, Secs. 8 and 9, Vol. 2, p. 661:
"Sec. 8. The wilful killing of an unborn quick child, by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be deemed manslaughter in the first degree.
"Sec. 9. Every person who shall administer to any woman pregnant with a quick child, any medicine, drug or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose, shall be deemed guilty of manslaughter in the second degree."
In a statute of Connecticut of 1838 we find the following, Sect. 15, pp. 145 and 146: "Sect. 15. Every person who shall wilfully and maliciously administer to, or cause to be administered to, or taken by, any woman, then being quick with child, any medicine, drug, noxious substance, or other thing, with an intention thereby to procure the miscarriage of any such woman, or to destroy the child of which she is pregnant; or shall wilfully and maliciously use and employ any instrument, or other means to produce such miscarriage, or to destroy such child, and shall be thereof duly convicted, shall suffer imprisonment in the Connecticut State Prison for a term not less than seven, nor more than ten years."
In Clarke v. State, 117 Ala. 1, 23 So. 671, 67 Am.St.Rep. 157, it was held that "Where a child born alive afterwards dies by reason of bruises inflicted on it, before birth, by the beating of its mother, the offense is murder."
The author of the opinion in this case quotes the following from Blackstone: (at *Page 357 
p. 674): "When a child, having been born alive, afterwards dies, by reason of any potion or bruises it received in the womb, it seems always to have been the better opinion that it was murder in such as administered or gave them."
The statement was made in argument that the question presented here is res nova in this State and we have been directed to no civil law authority. It is claimed that the decisions of the common law States are unanimous in denying recovery for damages to children en ventre sa mere. This is perhaps true as a consideration of the following cases to which we have been referred, would indicate. Allaire v. St. Luke's Hospital, 184 Ill. 359, 56 N.E. 638, 48 L.R.A. 225, 75 Am.St.Rep. 176: Dietrich v. North Hampton, 138 Mass. 14, 52 Am.Rep. 242; Buel v. United Rys. Co., 248 Mo. 126, 154 S.W. 71, 45 L.R.A., N.S., 625, Ann.Cas.1914C, 613; Drobner v. Peters,232 N.Y. 220, 133 N.E. 567, 20 A.L.R. 1503.
We select from the foregoing authorities for discussion the case of Allaire v. St. Luke's Hospital, not only because it is perhaps the best considered case but also because of an important dictum of the majority opinion and an able dissenting opinion by Justice Boggs.
We quote the following from the majority opinion [184 111. 359, 56 N.E. 640]: "That a child before birth is, in fact, a part of the mother, and is only severed from her at birth, cannot, we think, be successfully disputed. The doctrine of the civil law and the ecclesiastical and admiralty courts, therefore, that an unborn child may be regarded as in esse for some purposes, when for its benefit, is a mere legal fiction, which, so far as we have been able to discover, has not been indulged in by the courts of common law to the extent of allowing an action by an infant for injuries occasioned before its birth."
It is to be observed that the author of the opinion intimates that he cannot accept the view of the civil law.
Justice Boggs in a very learned dissenting opinion thus refers to the point upon which the case was decided at 184 Ill., page 370, 56 N.E. at page 641, 48 L.R.A. 225, 75 Am.St.Rep. 176, "The argument is, that at the common law an unborn child was but a part of the mother, and had no existence or being which could be the subject-matter of injury distinct from the mother, and that an injury to it was but an injury to the mother; that in such case there was but one person, — one life, — that of the mother. A foetus in the womb of the mother may well be regarded as but a part of the bowels of the mother during a portion of the period of gestation; but if, while in the womb, it reaches that prenatal age of viability when the destruction of the life of the mother does not necessarily end its existence also, and when, if separated prematurely, and by artificial means, from the mother, it would be so far a matured human being as that it would live and grow, mentally and physically, as other children generally, it is but to deny a palpable fact to argue there is but one life, and that the life of the mother. Medical science and skill and experience have demonstrated that at a period of gestation in advance of the period of parturition the foetus is capable of independent and separate life, and that, though within the body of the mother, it is not merely a part of her body, for her body may die in all of its parts and the child remain alive, and capable of maintaining life, when separated from the dead body of the mother. If at that period a child so advanced is injured in its limbs or members, and is born into the living world suffering from the effects of the injury, is it not sacrificing truth to a mere theoretical abstraction to say the injury was not to the child but wholly to the mother?"
This action is based upon Article 2315, Revised Civil Code which gives to the "child" a right of action for personal injuries, which survives to the father and mother, and to the parents for the loss of their "child". Our Civil Code repeatedly refers to the unborn "child".
Article 29: "Children in the mother's womb are considered, in whatever relates to themselves, as if they were already born; thus the inheritances which devolve to them before their birth, and which may belong to them, are kept for *Page 358 
them, and curators are assigned to take care of their estates for their benefit."
R.C.C. Art. 252: "If a wife happens to be pregnant at the time of the death of her husband, no tutor shall be appointed to the child till after its birth; but, if it should be necessary, the judge may appoint a curator for the preservation of the rights of the unborn child, and for the administration of the estate which may belong to such child. At the birth of the posthumous child, such curator shall be of right the undertutor."
R.C.C. Art. 954: "The child in its mother's womb is considered as born for all purposes of its own interest; it takes all successions opened in its favor since its conception, provided it be capable of succeeding at the moment of its birth."
R.C.C. 956: "When the child is born alive, though it may have been extracted by force from its mother's womb, and may have lived but an instant, provided the fact of its living be ascertained, it inherits the successions opened in its favor since its conception, and transmits them accordingly."
R.C.C. 1482: "In order to be capable of receiving by donation inter vivos, it suffices to be conceived at the time of the donation.
"In order to be capable of receiving by last will, it suffices to be conceived at the time of the decease.
"But the donations or the last will can have effect only in case the child should be born alive."
The term children has been held to include a child en ventre sa mere. Heath v. Heath, 114 N.Car. 547, 19 S.E. 155. "A devise to children includes a child en ventre sa mere." Swift v. Duffield, 5 Serg R., Pa., 38, 39.
It is argued that the articles of the Code, which we have cited relate to the property rights of the unborn child and have no application otherwise. We find the articles referred to be located as follows: Art. 29 is found in Book I, under the title Persons, general, art. 252, also in Book I, title Persons, subtitle, Minors. Arts. 954 and 956 occur in Book III, "Things" subtitle, "Of the Different Modes of Acquiring the Ownership of Things", and under the title of Successions, art. 1482, in Book III under the subtitle of "Donations and Testaments."
Article 29 which provides that children en ventre sa mere "are considered, in whatever relates to themselves, as if they were already born" is found in the first book of the Code, under the title "Of the Distinction of Persons." It is true that the illustration given in the article refers to successions, but we can not conclude that this is the only illustration of the effect of the article. Our present purpose in citing these articles of the Code is to show that under our system of law the foetus is constantly referred to as a "child". Certain property rights are acquired at the moment of conception, but a viable foetus capable of sustaining independent existence must, it seems to us, in the contemplation of the Civil Law, at least, be regarded as a child for the negligent killing of which an action can be maintained.
"Life", said Blackstone, "begins, in contemplation of law, as soon as the infant is able to stir in its mother's womb." If the Common Law decisions are uniformly opposed to this view, or if, as was said in the majority opinion in Allaire v. St. Luke's Hospital, the doctrine of the Civil law and Ecclesiastical law has not been indulged in by the Courts of the Common law, we cannot follow them in the application of principles of our law, which while it presents many analogies, is yet a distinct system. Perhaps there is tendency in this State to abandon some of the doctrines of the Civil law long held sacred in the interest of the common law. An example of such tendency is the introduction of trusts by a recent Act of our legislature. Our courts and lawyers now glibly speak of trustees, cestui que trust, etc. The Counsel in this case in argument and in brief stated that in the absence of precedent in our law, it was our "duty" to follow the common law authorities.
Without commenting upon what seems to be the modern tendency in this respect, we content ourselves with the observation that the civil law is still the basis of our jurisprudence. *Page 359 
In the case of Stewart v. Arkansas Southern R. Co.,112 La. 763, 36 So. 676, where the Court was considering the question of whether fright occasioned by the negligence of another was properly an item in a claim for damages, a number of decisions of the common law were cited as stating the contrary view, but the Court said, 112 La. at pages 768 and 769, 36 So. at page 677: "Under our jurisprudence and special laws, we would not be justified if we were to adopt this simple rule. In our Code (articles 2315-2317) the wise precept of the Institutes of Justinian are incorporated in substance, to wit: 'Juris praecepta sunt, alterum non laedere, suum cuique tribuere,' and, as translated and inserted in our Code, its text looks to the liability for all damages."
Under the title of Conventional Obligations, the Civil Code in Article 1934 paragraph 3 declares:
"* * * Where the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality or taste, or some convenience or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; a contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts, are objects and examples of this rule.
"In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none, but are bound to give such damages under the above rules as will fully indemnify the creditor, whenever the contract has been broken by the fault, negligence, fraud or bad faith of the debtor."
In Lewis v. Holmes, 109 La. 1030, 34 So. 66, 61 L.R.A. 274, it was held that a disappointed young bride could maintain an action in damages against a milliner for failure to deliver a number of dresses in time for use on her wedding trip. The Court said, at 109 La. page 1034, 34 So. at page 68, 61 L.R.A. 274: "In gauging this disappointment of the bride the surrounding circumstances must, as a matter of course, be considered. And one of these is the fact that entertainments were planned, and that for want of the dresses these entertainments would have to be given up; and another is her humiliation in going to her husband unprovided with a suitable trousseau. We do not think that the amount of $575, fixed by the district judge, is excessive."
It is argued that the English law known as Lord Campbell's Act passed in 1846 was the first recognition of the right of action for death by wrongful act as surviving to any one, and that since our Statute of 1884 to the same effect which is now a part of Article 2315 was an adoption of that law, we should give great weight to the interpretations of the British Courts, in considering it. We are disposed to do so, at least as far as the British view is not inconsistent with our system of law. But we do not find the English authorities entirely agreed upon the principles controlling here, for example in the case of The George and Richard, 3 Adm. Ecc. 466 decided in 1871 where it was held that a child en ventre sa mere could, if borne within due time, maintain an action for the death of its father drowned in a collision at sea, Sir Robert Phillimore in his decision, at p. 480, says: "I now approach the anxious and novel question of the right of the unborn child, of which the widow of Philip Noyes was pregnant at the time of the collision, to claim. There is no doubt that the law in many cases considers and protects the status of the unborn child. A bill may be filed in equity to restrain damages by a tenant for life where the infant, if born, would be the remainderman; so Mr. Justice Vaughn Williams observes on the subject of legacies to children. (1) 'The leading principle is, that where a bequest is immediate to children in a class, children in existence at the death of the testator, and these alone, are entitled; amongst which children, en ventre sa mere, are to be considered.' It has been argued, that the peculiar language of Lord Campbell's Act requires the actual existence of the claimant as a condition precedent to a right of action. I am not of this opinion. Although, as has been said, twenty-five years have passed since Lord Campbell's Act, and this particular question has not arisen *Page 360 
for decision, it seems to have been considered in one case as within the purview of this statute."
In Badie v. Columbia Brewing Co., 142 La. 853, 77 So. 768, our own Supreme Court held that a right of action survived to a child en ventre sa mere and that it could recover after its birth for the loss of its father, killed by the wrongful act of another. This decision has an important bearing in the instant case for, as we see it, it presents the converse of the proposition we are discussing. If a child en ventre sa mere is in contemplation of law a separate entity, to the extent that a right of action survives to it for injury to its father inflicted during its gestation, why does not the right of action survive to the father for personal injuries to the child, inflicted prior to parturition? The statute Article 2315 provides that the right of action in the event of the death of the child shall survive to the father and in the event of the death of the father to the child in the same terms.
Our Code, art. 29, declares that children in their mother's womb are, in whatever relates to themselves considered as if they were already born. This Article as it appears in the Code of 1870, is in the same language as it appears in the Code of 1825. In the Code of 1808 it is different. Under the title "Of the Distinction of Persons Established by Nature", art. 7 reads as follows:
"Art. 7. Children in their mother's womb, cannot be reckoned among the number of children, not even for the purpose of imparting to the father, the rights and advantages which the law may grant to parents on account of the number of their children."
"Yet the hope that such children may be born alive, cause them to be considered, in whatever relates to themselves, as if they were already born; thus the inheritances which fall to them, before their birth, and which belong to them, are kept for them, and curators are assigned to take care of their estates for their benefit."
It will be observed that the words of limitation found in the original text of the Article have been omitted and that since the adoption of the Code of 1825, children en ventre sa mere are considered both "in whatever relates to themselves." The language used is of the most sweeping character.
The following definition of "whatever" we find in the Century Dictionary: "Of what kind or sort it may be; no matter what; any or all that; applied to persons and things: as, whatever person is appointed must be satisfactory to the court."
It is suggested that because the illustration given in the article relates to successions, the article has no other application. We cannot adopt this view. If such had been the intention of the framers of the Code, the article would have read "whatever relates to their property rights" or some words would have been used importing qualification or limitation. We attribute the use of an illustration concerning property rights to the fact that such would naturally be the most frequent application of the principle and consequently would the more readily occur to the mind of the author.
If it be objected that there is no period of gestation mentioned at which the embryo may be said to be a child, we reply that we are now considering the case of a foetus which had advanced to the final stage of gestation, just prior to parturition, a stage of prenatal life, when all authorities, medical and legal, agree the foetus is viable.
Blackstone, as we have seen, places the beginning of life in a legal sense at the time when the child is able to stir in its mother's womb, a much earlier period of prenatal existence.
It was under the ancient law and is now murder to cause the mother to abort at this period, because the destruction of the child at this period, is a killing of the child. Killing imports death and death, life.
We think it manifest that injury to a child at this period is in contemplation of law, injury to a living child, for which the child if it survives its birth, may maintain an action under art. 2315 of our Code, and if the child be killed at this period, before its birth, we see no reason why its parents cannot maintain an action for the death of their child. *Page 361 
It is said that it is difficult to measure the extent of suffering the child experiences and the extent of loss the parents suffer, under these conditions. No doubt it is, but no more so than it is to value moral suffering, mental anguish, etc.
Moreover, mere difficulty in assessing damages resulting from a wrongful act does not prevent an award. It is the duty of the Courts to give such damages as will approximate the loss. Wall v. Hardwood Mfg. Co. 127 La. 959, 54 So. 300.
Under art. 1934 of our Code damages are not limited to pecuniary loss, but may be based upon the deprivation of some intellectual enjoyment, religious, moral or aesthetic. As we have seen a bride's disappointment over the absence of dresses intended as a part of her trousseau, is properly the subject of damages ex contractu.
In O'Meallie v. Moreau, 116 La. 1020, 41 So. 243, damages were allowed because a picnic party were compelled to picnic at a place in Milneburg, other than the one they had reserved. The Court holding that they were entitled to compensation for "their disappointment, annoyance, vexation, and mortification".
If the deprivation of intellectual, moral and aesthetic pleasure, a bride's chagrin because of the absence of ceremonial dress, and the vexation and annoyance of a party of picnickers may be judicially determined, why, we ask, is there much difficulty in appraising the suffering of an infant injured en ventre sa mere and dying a few days after birth. The deprivation of what Blackstone calls the God given right to live, certainly equals in dignity and certainty of appraisement, the bride's chagrin and the picnickers disappointment. And we surmise there can be no question in so far as the injury to a parent is concerned, that the loss of a child, whether in esse or in posse, far transcends any consideration of intellectual, moral or aesthetic pleasure. Parentage is the normal state of connubial felicity, and is frequently the sine qua non. The loss of the first opportunity to attain this great benediction may forever consign the spouses to a childless, loveless marriage.
The maternal instinct is one of the great elemental passions of life. Its gratification often marks the difference between a happy, peaceful and contented existence and a leaden footed march through life's pathway, far sweeter than the music of the spheres, or the soft cadences of "An Aeolian Harp when swept by the fingers of the night wind" to the mother's ears are the first plaintive notes of the "heir of all the ages."
Our conclusion is that the parents, either or both of a child, whose death, three days after birth, is caused by the negligence of another, by reason of injuries inflicted before birth, and at an advanced stage of pregnancy of the mother shortly before parturition, have a right of action under Article 2315, Revised Civil Code, for damages as having survived to them and for the loss of their said child, as conferred upon them directly under the terms of the article.
We wish to acknowledge our indebtedness to Mr. Benjamin W. Kernan, for the very able brief filed in this case as amicus curiæ, which has been of great assistance to us in the consideration of the novel question involved.
For the reasons assigned herein and stated in Johnson v. South N. O. L. T. Co., Orleans No. 9048, see Louisiana and Southern Digest, the judgment of the District Court is annulled, avoided and reversed, and it is now ordered that this case be remanded for further proceedings, according to law and not inconsistent with this opinion. The costs of this appeal to be borne by defendants. *Page 362