HAMITER, Justice.
 

 Jesse A. Brantley, who is engaged in the business of operating a boat dock and of selling bait for sport fishing, instituted this suit to recover damages of $8,000 from the Tremont & Gulf Railway Co. He complains that on or about June 21, 1950 the defendant wantonly cut the dam or levee adjoining a pond of water, located in Ward 8 of Ouachita Parish and possessed by him under a lease from the owner Sandel Berry, releasing therefrom and causing the loss of more than 400,000 minnows or shiners (a small fish used for bait in fishing) which belonged to him and had a valuation of two cents each.
 

 
 *179
 
 After a trial on the merits of the case the district court awarded plaintiff the sum of $2,000. Defendant appealed from the judgment.
 

 Answering the appeal, plaintiff asks that the award he increased to $4,000.
 

 On a right of way granted in 1927 by Sandel Berry across his land situated in Ouachita Parish, as shown by the record, the Brown Paper Mill Company, Inc. constructed, and it maintained for a number of years, a railroad track running approximately north and south. The natural drainage of water over the land was from west to east; and at the fill or embankment, on which the track was situated and which crossed the drainage, the water passed, initially under a small wood bridge and, later, through a substituted 36 inch concrete culvert which remained only a few years. Following the removal of this culvert the water, after reaching the embankment, drained north along the track a distance of several hundred feet and then east beneath a trestle.
 

 In the fall of 1947, subsequent to the acquisition of the mentioned railroad track by this defendant from Brown Paper Mill Company, Inc., Sandel Berry completed on his property ■ a pond of water having an area of approximately four acres. It was created principally by constructing a levee or dam some 300 feet long across the above described natural drain. The structure was placed west of the railroad right of way, and it lay therefrom a distance of approximately 25 feet at the south end and about 160 feet at the north end. Following the completion of this levee the drainage was around the south end thereof and then north, paralleling defendant’s-track, to the trestle.
 

 On May 24, 1950 plaintiff obtained from Berry and recorded a written lease on the pond. It granted to him ingress and egress over the lessor’s property and was for a term of one year. Two days thereafter he commenced stocking this pond with thousands of minnows which were to be used in connection with his bait selling operations.
 

 Meanwhile, the drainage of water around the south end of the dam caused some erosion to the embankment supporting the railroad track. With the view of having this condition remedied defendant’s vice-president and general manager, along with its attorney, met Berry at the site on October 5, 1949 and sought to persuade him to perform at his expense such work as was necessary to divert the water from the south end of the levee and cause it to drain around the north end thereof. When the property owner refused, the mentioned official said “* * * all right, we can’t permit this-condition to continue to exist, we have got to do something about it, and if you are not going to do anything about it then we are willing to have it fixed, if it is
 
 *181
 
 all right with you.” To this Berry offered no objection; in fact, he consented to defendant’s obtaining dirt from his property for a suggested extension by it of the south end of the dam. Five days later defendant, with fresh dirt and by the use of a rented bulldozer which op■erated ten hours, provided such extension.
 

 About June 18, 1950 defendant undertook to make repairs on such south extension, using therefor hand labor and wheelbarrows and more fresh dirt, it having experienced considerable erosion. Before the work was completed, however, a •series of heavy rains (rather unusual for that season of the year) occurred, they having begun about midnight of June 20, 1950 and having endured for approximately 24 hours. The precipitation for this period, recorded at an official weather station some eight or ten miles away, totaled •6.68 inches.
 

 On the morning of June 21, 1950 some of the employees of defendant went to the scene and sought to continue the repair work which had become more burdensome because of the rains. But their efforts were not too successful. For this reason, and in order to prevent further damage to the levee’s extended south end and with the ultimate view of protecting the railroad embankment in that immediate area, •defendant’s track supervisor proceeded to a point on the dam near its north end, and. there, without the knowledge of the owner Berry or plaintiff, he cut a sizable opening which permitted the greater part of the pond’s water to escape rapidly and to flow to and through a ditch that existed beneath the railroad trestle and coursed easterly. Along with the water went thousands of minnows for which damages are sought in this action.
 

 Appellant, on this appeal, first contends that it “* * * had a right to restore the natural drainage by making the opening in the dam which plaintiff complains of and that if plaintiff suffered any damage as a consequence of defendant’s exercise of this right (which is denied), his recourse is not against defendant.”
 

 In making this contention appellant invokes the well ‘known principle of law, enunciated by LSA-Civil Code, Article 660, that a servitude is due by the estate situated below to receive the waters which run naturally from the upper estate, but the proprietor above can do nothing which may render the servitude more burdensome. This principle, in our opinion, cannot aid defendant in its attempt to escape liability for the consequences of the act of trespass committed on Berry’s property. Interference with and change of the natural drainage in question first occurred through the efforts of Brown Paper Mill Company, Inc., defendant’s ancestor in title, in erecting the railroad embankment which blocked the regular flow and diverted the water north to the trestle.
 
 *183
 
 True, Berry’s later building of the dam provided additional interference. But defendant, with full knowledge of that structure, has at no time sought by proper and legal means to obtain a removal of the dam and to reestablish the natural drainage. On the contrary it actively undertook the construction of an extension thereto and has even expressed approval of the levee’s existence. Thus, the vice-president and general manager testified: “I wouldn’t complain about the dam, I want a good dam there, sir.”
 

 Secondly, and alternatively, appellant takes the position that “* * * the proximate cause of such damage, if any, as plaintiff might have sustained was an act of God to which defendant’s acts were only incidental, and as a consequence that defendant is not liable.” And appellant argues that plaintiff, in view of the excessive rains and the fresh fill on the levee’s south extension, would have sustained all of the damage of which he now complains irrespective of any action on defendant’s part. This argument, of course, is purely conjectural. On the other hand it can be said with certainty that defendant’s cutting of the levee naturally led to and was a (if not the) proximate cause of the loss sustained. Its act, to say the least, concurred with the rains to cause the damage. This being true defendant cannot avail itself of the protection of the rule of law which relieves one of liability for the result of a fortuitous event. Reynolds v. Texas & Pacific Railway Co., 37 La.Ann. 694; Southern Air Transport v. Gulf Airways, Inc., 215 La. 366, 40 So.2d. 787; Sharp v. Kahn, La.App. First Circuit, 143 So. 514, 38 American Jurisprudence, verbo Negligence, Section 7.
 

 As a final defense it is said that “* * * even if defendant should be held technically liable, plaintiff has so grossly exaggerated his claims of damage and has so utterly failed to carry the burden of proof imposed upon him to establish the amount of his damage with reasonable certainty that, in any event no monetary judgment can be sustained by the evidence which has been adduced.” Countering, plaintiff insists,, through his answer to the appeal, that the district court’s award of $2,000 should be-increased.
 

 When it is clear that a plaintiff has-sustained some damages as a result of the fault of the defendant, according to our well settled jurisprudence, his demands will not be rejected merely because he cannot: establish exactly the amount suffered. Under such circumstances the court must fix the quantum as best it can and, in this-connection, the trial judge is vested with much discretion. Green v. Farmers’ Consolidated Dairy Co., Limited, 113 La. 869, 37 So. 858; Wall v. Hardwood Mfg. Co., 127 La. 959, 54 So. 300; Schmidt v. City of New Orleans, 160 La. 281, 107 So. 110; Germann v. 557 Tire Co., Inc., 167 La. 578,
 
 *185
 
 120 So. 13, and Franklin v. Arkansas Fuel Oil Co., 218 La. 987, 51 So.2d 600.
 

 That this plaintiff was damaged as a result of the act of trespass cannot be denied. Even defendant’s general manager and its track supervisor admitted, in their testimony, that a few days after the occurrence they saw dead minnows lying in the ditch beneath and south of the trestle. And plaintiff proved that on June 16, 1950 he purchased for $800 and placed in the pond approximately 100,000 minnows, and that following the cutting of the levee he seined the water remaining and found none of them.
 

 Of course, the balance of the damage claim was sought to be established by the testimony of plaintiff and others' based on estimates made (1) of minnows seined or trapped elsewhere and placed in the pond and (2) of dead shiners which they dipped up along the ditch through which the escaping water passed. Apparently, however, this was the only method of proof to which plaintiff could resort.
 

 Under the circumstances existing here the trial judge, as pointed out above, was vested with much discretion in fixing the quantum of damages. We cannot conclude that 'he has abused that discretion or has manifestly erred in awarding to plaintiff the sum of $2,000.
 

 Foi; the reasons assigned the judgment appealed from is affirmed.