138 So.2d 688 (1962)
Prier B. WRIGHT, Plaintiff and Appellee,
v.
The SUPERIOR OIL COMPANY, Defendant and Appellant.
No. 505.
Court of Appeal of Louisiana, Third Circuit.
March 8, 1962.
Rehearing Denied March 30, 1962.
Certiorari Denied May 18, 1962.
Plauche & Plauche, by S. W. Plauche, Jr., Lake Charles, W. W. Bell, Jr., Houston, Tex., for defendant-appellant.
Saal & Saal, by I. P. Saal, Sr., and I. P. Saal, Jr., Gueydan, for plaintiff-appellee.
Before CULPEPPER, FRUGÉ and TATE, JJ.
CULPEPPER, Judge.
Defendant appeals from a judgment awarding plaintiff damages in the sum of $3,500 for injuries to plaintiff's twelve-inch water well, used to irrigate rice fields. Plaintiff has answered the appeal seeking an increase in the award to $7,500.
The well was allegedly damaged on October 19, 1960 by seismograph explosions set off by the defendant while conducting geophysical operations on plaintiff's property, under the provisions of a mineral lease granted by plaintiff to defendant. The defendant denies any causal connection between its seismograph operation and the alleged damage to plaintiff's water well. The defendant also contends that if liability is found on its part, the plaintiff has failed to prove the amount of damages claimed.
The record shows that shortly before the day the seismograph operation took place, an agent of the defendant called upon Mr. Luther Hardee, son-in-law of plaintiff. Mr. Hardee was in charge of the operation of the plaintiff's rice farm, and had been for some time prior to this occurrence, due to the plaintiff's physical condition. The testimony of Mr. Hardee is that upon seeing the seismograph crew, he requested that they not blast in close proximity to his water well. The defendant's employees then requested that Mr. Hardee start the pump prior to their setting off their explosives. Mr. Hardee refused to do this and became somewhat angry at the agents of the defendant who were conducting the operation. The defendant then left the plaintiff's property and returned a day or two later, during the absence of Mr. Hardee, and set off a 2½ pound charge 795 feet away from this particular water well. Upon Mr. Hardee's return to the plaintiff's *689 property and upon learning that the charge had been set off, he started his pump and noticed that a small quantity of sand and gravel was being emitted.
Mr. Hardee testified the sand and gravel comes out of the well for only a few minutes after it starts pumping and after that only pure water is discharged. This witness did not know the age of the well, but stated positively that prior to the charge being set off by the defendant, there had never been any sand or gravel pumped from the well.
Mr. Vinson W. Hair, a neighbor of the plaintiff, testified that he owned a well which was approximately forty-three years old and it had never pumped sand or gravel.
The plaintiff's next witness was a Mr. Lenis Mire, an employee of Mr. Hardee, who testified that he usually helped Mr. Hardee start the well and that prior to this occasion he had never known the well to pump sand or gravel. Mr. Mire further stated that following the shot by the defendant the well started pumping both sand and gravel.
Mr. Jack O. Bonin, a supervisor for Stamm-Scheele, Inc., water well drillers, was qualified as an expert and testified that in 1952 he had installed a complete new pump on the plaintiff's well. Mr. Bonin stated that following the installation of the pump it was started and no sand or gravel came out. Following the occasion giving rise to this suit, Mr. Bonin tested the well and found it pumped sand and gravel for the first few minutes it was in operation. Mr. Bonin was of the opinion that the gravel was getting into the well from either a crack or break in the lower casing or screen in the lower portion of the well, and was being sucked up through the pump and out. This witness stated that this would cause damage to the pump because of its abrasive effect. The witness was of the further opinion that the break in the well would become sealed after a short time thus explaining why the water would clear up after running for only a few minutes. Mr. Bonin testified that it was a "debatable question" as to whether an attempt should be made to place new lining and a new screen in this well because it would cost $3,000 to $4,000 and the capacity would be reduced. This witness estimated that the cost of digging a new well was approximately $7,000.
Mr. Bertrand N. Sweeney, Jr., an employee and part owner of Stamm-Scheele, Inc., was also qualified as an expert on deep water wells and testified that the samples of gravel taken from the well were getting bigger, indicating to him that the crack in the well was getting larger.
The above evidence clearly establishes that plaintiff's well was damaged by the geophysical operations conducted by the defendants. The liability of the defendant in cases of this sort has been frequently determined by our courts. See Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845; Pate v. Western Geophysical Co. of America, La.App., 91 So.2d 431.
On the issue of quantum, defendant's first argument is that plaintiff has failed to establish by a preponderance of the evidence that he has sustained any damage whatsoever. Defendant points out that the well was admittedly at least thirty years old at the time it was damaged; that the average life of a well is highly conjectural, according to the expert testimony, and may be anywhere from ten to fifty years; that this particular well had already lasted about as long as the average well; that even after the alleged damage it continued to pump its normal capacity of 3000 gallons per minute, and, according to the experts, might continue to do so for from five to fifteen years. Defendant cites Edwards v. Miranne, La.App., 11 So.2d 271, Jacobs v. A. Solomon, 219 La. 237, 52 So.2d 763 and several other cases for the proposition that proof of property damage must be reasonably certain and the court will not render an award for speculative or conjectural damages.
*690 In answer to this argument, we first note there is a clear distinction between the measure of proof necessary to establish the fact that the plaintiff has sustained some injury and the measure of proof necessary to enable the court to fix the monetary value of damages. In the instant case, plaintiff has proved by a preponderance of the evidence that he has suffered some damage because the well now emits gravel, which has a severe abrasive effect on the pump and also indicates the casing or screen is now cracked. Mere uncertainty as to the amount of damages will not prevent recovery. This rule is clearly stated in Brantley v. Tremont and Gulf Railway Company, 226 La. 176, 75 So.2d 236 (La.S.Ct.1954) in which the court held as follows:
"When it is clear that a plaintiff has sustained some damages as a result of the fault of the defendant, according to our well settled jurisprudence, his demands will not be rejected merely because he cannot establish exactly the amount suffered. Under such circumstances the court must fix the quantum as best it can and, in this connection, the trial judge is vested with much discretion. Green v. Farmers' Consolidated Dairy Co., Limited, 113 La. 869, 37 So. 858; Wall v. Hardwood Mfg. Co., 127 La. 959, 54 So. 300; Schmidt v. City of New Orleans, 160 La. 281, 107 So. 110; Germann v. 557 Tire Co., Inc., 167 La. 578, 120 So. 13, and Franklin v. Arkansas Fuel Oil Co., 218 La. 987, 51 So.2d 600."
In awarding plaintiff $3,500 the trial court used the only evidence in the record as to the quantum of damages, i. e., the testimony of plaintiff's expert witness, Mr. Sweeney, who, in answer to a question by the court testified as follows:
"Q After reworking the well in 1952, and considering the time that elapsed, and the installation of a new pump, could you give me your opinion as to the value of the Wright well in October of 1960, prior to the time any sand began to accumulate in the pipe?
"A If I wereyou are speaking of only the well, not the pumping equipment?
"Q Yes, sir, the well.
"A Because the type that's in there, is rather expensivebut just the well?
"Q Just the wellI am assuming that the pump could be salvaged.
"A Yes, sir. Knowing, or not knowing, the age of the well, but knowing it was a very old well, I would have put a value on thatat that time of something between $3500 and $3900.
"Q Not including the pump or the engine?
"A No, sir, just the well itself the hole in the ground with the casing and screen in it. That is not a replacement figure, but that would be an appraisal of the value of the well at that time.
"Q Can you give me an opinion as to the value of the well after the shot was made and the damage occurred, that would of course, entail approximate salvage value from the old casing in it?
"A There is no salvage value to what is there, because the labor involved to pull it, would cost more than the casing is worth, because of the age, and you don't know what condition it is in. But having seen the well pump recently, and having seen it pump back in '52, I wouldn't want toif I were going to buy it for my own accountI wouldn't pay very much for it."
Although defendant argues strenuously that the award of $3,500 fails to take into account the depreciation of the well, the above quoted portion of Mr. Sweeney's testimony clearly shows that he had made *691 this appraisal with full knowledge of the age and condition of the well before it was damaged. Defendant has not introduced in evidence any contradictory appraisal. Under all of the circumstances we cannot say that the trial judge was manifestly erroneous.
For the reasons hereinabove set forth the judgment appealed from is affirmed. All costs of this appeal are assessed against the defendant.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.