193 So.2d 344 (1966)
Russell CLOUATRE
v.
TOYE BROTHERS YELLOW CAB COMPANY.
No. 2364.
Court of Appeal of Louisiana, Fourth Circuit.
December 5, 1966.
Rehearing Denied January 9, 1967.
Writ Refused February 24, 1967.
*345 George J. Kambur, New Orleans, for plaintiff-appellee.
Deutsch, Kerrigan & Stiles, Lansing L. Mitchell and Charles F. Seemann, Jr., New Orleans, for defendant-appellant.
Before YARRUT, SAMUEL, and CHASEZ, JJ.
SAMUEL, Judge.
This is an action for personal injuries sustained by plaintiff, a taxicab driver, in an automobile accident. The manner in which the accident occurred is not in dispute. On January 11, 1964, without putting the car in gear or setting its hand brake, the driver of a defendant Yellow Cab left his vehicle six or eight feet behind plaintiff's Checker Cab in front of a New Orleans hotel. The unattended Yellow Cab rolled forward while plaintiff was unloading luggage from the trunk of his vehicle, crushing his legs between the bumpers of the two cars.
The case was tried to a jury whose verdict of $10,000 was made the judgment of the district court. Defendant has appealed therefrom. In this court defendant concedes negligence on its part and limits this appeal to quantum. It contends: (1) the judgment should be reduced by such amount as was awarded for lost earnings, or in the alternative, the matter should be remanded for a new trial, because of the admission in evidence, over timely objection, of hearsay testimony relative to loss of earnings; and (2) the award for personal injuries is excessive.
The alleged hearsay testimony was given by Lloyd Mumphrey, a vice-president of Checker Cab Company, the owner of the cab plaintiff had been driving at the time of the accident. Mr. Mumphrey testified plaintiff rented his cab from Checker for $10 a day, paid the cost of gasoline himself, and retained all of the money he collected in excess of the rental and gasoline costs. This witness stated of his own knowledge *346 he knew plaintiff worked 12 hours per day and 6 days per week prior to the accident, that his records indicated plaintiff was unable to work from January 11 to March 30 of 1964 at which latter time he attempted to do part-time work for 3 or 4 days, was unable to continue and did not return to work until April 27, 1964. He did not know how many hours per day plaintiff worked following the accident. He also stated that prior to the accident he knew plaintiff had been a hard, vigorous worker, who probably had earned more than the average driver, and the net earning of the average driver was approximately $15 per day. He admitted no records were kept of what Checker's drivers earned, he did not know of his own knowledge what such earnings amount to, either for the plaintiff or for any other driver, and such information as he had on the subject of driver earnings was based upon a period of 15 years in the taxicab business and on what he had been told by cab drivers. The defendant made timely objection to the testimony relative to the net earnings of cab drivers and it is this part of the testimony which defendant contends was hearsay and prejudicial.
In connection with the question of earnings plaintiff testified: He rented a taxicab from Checker for $10 per day and paid for the gasoline used, approximately $3 per day. Prior to the accident he worked 6 days each week and 12 hours a day, earning a net income for himself of $15 per day or $90 per week. He was unable to work at all from the date of the accident, January 11, 1964, until March 30, 1964, when he tried to return. But he suffered so much from his injured legs that after 4 days he again had to stop entirely. He did not return to work until April 27, 1964 some three and one-half months after the accident. But, because of his legs, he was unable to work his customary 12 hours each day. From April 27, 1964 to the date of trial, April 6, 1966, he has been able to work only 6 or 7 hours daily and his net earnings during that time have amounted to $40 per week.
The only other evidence in the record relative to plaintiff's earnings is some testimony given by the plaintiff concerning his income tax returns for 1963. While those returns were not introduced in evidence, it appears from the testimony that plaintiff had gross earnings of $3,166.40 and net earnings of $1,200 during 1963. However, plaintiff also testified that from January to April 30, 1963 he did very little work because he spent practically all of his time with his 8-year-old son who was hospitalized and subsequently died following heart surgery. After the boy's death he was depressed and became ill himself, first with double pneumonia and then with "flu", and was unable to work full time until September, 1963. Under these circumstances the 1963 tax returns are of little or no evidentiary value in determining plaintiff's average income prior to the accident.
Although it is better practice to introduce corroborating evidence, where such corroborating evidence is not produced and is not shown to be available, a plaintiff's detailed and uncontradicted testimony as to loss of earnings may by itself constitute sufficient proof thereof if the same be reasonable and if it be so accepted by the trial court or jury; a claim for loss of earnings need not be proved with mathematical certainty, but only by such proof as reasonably establishes the claim; and in cases where there is a legal right to recover, and the exact amount of damages cannot be determined, a court or jury has discretion to assess reasonable monetary damages based upon all the circumstances of the loss. Stevens v. Dowden, La.App., 125 So.2d 234, and cases cited therein at page 237.
In the instant case we are of the opinion, as the jury also must have been, that a net earning of $15 per 12-hour day is a reasonable and not an excessive amount. As no showing has been made that there was corroborating evidence available to the plaintiff, and as there was no evidence to the contrary, nor any reason to disbelieve the plaintiff on this question, his testimony *347 alone was sufficient to establish the fact that prior to the accident he did earn $15 per day. The only portion of Mr. Mumphrey's testimony which properly could be considered hearsay was that concerned with the average daily net earnings of taxicab drivers. In this he merely corroborated plaintiff's testimony. Since plaintiff's average daily net income was established by plaintiff's testimony alone, the defendant has not been prejudiced by the alleged hearsay.
Testimony relative to the injuries sustained by plaintiff was given by plaintiff himself, Dr. Philip P. LaNasa, a general practitioner and the treating physician, and three orthopedic specialists, Drs. Raymond F. Kitziger, Irvin Cahen and O. L. Pollingue.
Plaintiff's testimony is that immediately following the accident he was unable to walk or stand and was taken to a hospital where he remained for 5 days. He suffered pain in the back and the knees. Bumper marks remained on the back of his legs for 3 months. He was treated by Dr. LaNasa and because of pain, as we have already set out, was unable to return to work until April 27, 1964. At that time he found he could not work the full 12-hour day as he had done prior to the accident; after working only 6 or 7 hours his legs "started giving up". At the time of trial, more than two years after the accident, he was still being treated by Dr. LaNasa and he continued "on and off" to experience pain in the knees and in the back of his legs.
Dr. LaNasa testified: He saw plaintiff at the hospital on the date of the accident, January 11, 1964. At that time plaintiff was unable to stand or bear weight on his legs or to fully extend them. There was marked and severe ecchymosis (discloration) and bleeding in the tissues. Tenderness and muscle spasm were found indicating abnormality in both knees. Much swelling and hemorrhaging in the popliteal fascia (the area behind the knees) was found. The left knee was the more seriously injured, but both knees were damaged. Plaintiff was in great pain. X-rays indicated no fractures or dislocations and Dr. LaNasa concluded the tissues and ligaments had been damaged. Because he felt the injuries were so severe, he called Dr. Kitziger for consultation. Plaintiff was hospitalized for 5 days. He was seen three to four times weekly for an extended priod of time thereafter and at the time of the trial was receiving some treatment. The doctor continues to find muscle spasm at times, particularly hamstring spasms in the upper legs, and plaintiff does not have a full range of motion. Dr. LaNasa characterized the injury as a crushing type to the tissues resulting in permanent tissue damage. He was of the opinion that plaintiff will have trouble with his knees for the remainder of his life.
Dr. Raymond F. Kitziger examined plaintiff in the hospital at the request of Dr. LaNasa three days after the accident. He found generalized tenderness and a good range of motion in the right knee without fusion or water on the knee and no signs of torn cartilages or ligaments. He described the injury to this knee as mild. He was unable to make a complete examination of the left knee because it was held in flexion and plaintiff was unable to move because of pain. The hamstring muscles behind that knee were in spasms. There were bruises and swelling in this area. The doctor found no evidence of torn ligaments or tenderness along the joint line but he was unable to examine for torn cartilage. He described the injury to the left leg as a mild, crushing injury with secondary hemorrhage in the popliteal area. He recommended no weight bearing on the left leg, use of warm soaks, with active motion to begin within a week, and ordered medication to reduce the swelling. He saw plaintiff on only the one occasion and agreed it is possible to have pain without objective findings.
Dr. Irvin Cahen examined plaintiff on June 15, 1965, one and one-half years after the accident. This was the only time he saw plaintiff and his examination, during *348 which time he performed various orthopedic tests and had X-rays taken, took approximately 25 to 30 minutes. The X-rays were negative as to bone injury. Plaintiff walked without a limp and his mobility was hesitant but coordinative. While plaintiff was lying down the doctor observed tightening of the musculature in the back of the thigh (the hamstring muscle). He found no muscle spasms or atrophy. In his opinion there were no abnormalities of the knees which required additional treatment. He did not agree with the initial medical report that plaintiff sustained an injury to the inner cartilages of his knee joint inasmuch as his examination did not reveal cartilage involvement. Accordingly, he was of the opinion that plaintiff had no need for orthopedic care and could return to his usual occupation. In answer to a hypothetical question based primarily on Dr. Kitziger's examination and findings three days after the accident, Dr. Cahen stated he was of the opinion that plaintiff should have recovered from his injuries several weeks after the occurrence of the accident.
Dr. O. L. Pollingue made one examination approximately two years after the accident. At that time plaintiff was complaining of pain in the knees. A thorough orthopedic examination was performed. This doctor found slight tenderness in the joint lines of both knees over the popliteal fascia. He was unable to find any other objective symptoms or orthopedic basis for continued pain. He stated that while it is possible to have pain without objective findings, over the long period of time here involved such pain would be unusual.
From the foregoing resumé of the medical testimony it is apparent that the opinions of at least two of the orthopedic specialists, Drs. Kitziger and Cahen, each of whom examined plaintiff on only one occasion, are in conflict with the opinion of the treating general practitioner, Dr. LaNasa. However, it is also apparent the jury was satisfied, and so are we, that plaintiff's injuries were much more serious than they were pictured by the specialists, despite the fact that ordinarily there should have been a recovery from those injuries in a comparatively short period of time. The question before us is not what ordinarily would occur but what actually occurred. And we note that Dr. Pollingue found slight tenderness in the joint lines of both knees when he examined plaintiff about two years after the accident. This involves a finding of fact by the jury and we cannot say it committed manifest error in giving more weight to the testimony of Dr. LaNasa than it did to the testimony of Drs. Kitziger and Cahen.
The verdict and judgment are in the lump sum amount of $10,000, without itemization. Stipulated medical, hospital and drug expenses incurred by plaintiff amounted to $1,295.82. The only two other items making up the $10,000 total were loss of earnings and the award for personal injuries. Plaintiff's petition prays for loss of earnings in the amount of $2,600. We are satisfied from the record that as a result of the accident plaintiff did lose three and one-half months from work, during which time he would have earned $90 per week, and approximately $50 per week thereafter for a period of time sufficiently long as to result in a total loss of earnings in excess of $2,600. We therefore subtract the expenses, $1,295.82, and the loss of earnings as prayed, $2,600, from the total award of $10,000. This leaves, in round figures, $6,100 as the amount awarded for the injuries.
Under the doctrine enunciated in the Supreme Court cases of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64, and Ballanga v. Hymel, 247 La. 934, 175 So.2d 274, we have considered the amounts of awards granted or approved by appellate courts of this state for somewhat similar injuries to determine whether or not the award of $6,100 for the injuries suffered *349 by plaintiff in the instant case is excessive to the extent that it constitutes an abuse of the "much discretion" given to the jury by LSA-C.C. Art. 1934(3). Our conclusion is that the award is not excessive to the extent of constituting an abuse of the jury's discretion. See Ball v. Marquette Casualty Company, La.App., 176 So.2d 799.
The judgment appealed from is affirmed.
Affirmed