BLANCHE, Judge.
Plaintiff, Teledyne, Inc., successor to Irby Steel Company, filed suit against defendants, W. R. Fairchild Construction Company, Limited, and J. W. Snowden Construction Company, a joint venture (hereinafter referred to as “Joint Venture”) and Western Casualty and Surety Company, for sums allegedly owed Irby Steel Company on a subcontract in connection with the construction of the East Pearl River Bridge and approaches. In due course defendants answered and the Joint Venture reconvened against plaintiff, claiming entitlement to damages in excess of the amount which Joint Venture owed but had not paid plaintiff. Both sides perfected devolutive appeals from the trial court’s judgment.
The factual situation involved in this litigation is ably summarized by the trial judge as follows:
“Plaintiff on the main demand has asked judgment against defendants in the principal sum of $115,272.41 with interest, attorney fees and costs.
“The joint venture in reconvention has admitted its liability to Irby Steel in the sum of $110,861.87 but has demanded judgment on a reconventional demand against Irby Steel in the sum of $585,-656.97 for damages over and above the balance of the sub-contract sum which it admits owing Irby Steel together with the joint venture’s claim for interest and costs.
“This controversy grows out of a subcontract between the parties represented by letter of June 6, June 20 and July 1, 1966 under which Irby Steel agreed to fabricate and deliver to the joint venture for the total price of $816,750.00 various steel items required by the joint venture as prime contractor under a public works construction contract dated July 13, 1966, between the joint venture and the Louisiana Department of Highways for the construction of the East Pearl River Bridge and approaches under Louisiana State Project No. 450-19-01 for a contract price of $6,478,659.50. Irby Steel admits payment to it of all sums due under the sub-contract, except for a balance of $115,272.41 which as stipuated at the trial was properly subject to a credit of $3,800.00 as the cost of barge transportation which should have been paid by Irby Steel, together with the sum of $610.54 as the cost to the joint venture of straightening certain hand rails, which was also the obligation of Irby Steel, thus reducing the principal balance of Irby Steel’s claim to the sum of $110,-861.87.
“The sub-contract reflects that the delivery date of all steel to be furnished by Irby Steel was October 1, 1967. Irby Steel was unable to make deliveries by this delivery date and it was further shown that it was unable to make deliveries of three of the four principal steel components by the very latest delivery date which the joint venture had advised that it would receive them in order to timely complete the bridge under its contract with the Highway Department. There is no question that Irby Steel could not make the delivery date and the main defense advanced by Irby Steel was *236 to challenge the extent of the damages which the joint venture alleges that it suffered.
“The four principal steel components to be delivered by Irby Steel and which formed the principal basis for this controversy, are the east and west steel approach spans, and the east and west bascule leaves, which were required to be installed after installation of the approach spans and which form a lifting draw bridge. Each of these four components are in excess of 100 feet in length, are composed of large steel girders and various cross members and accessories that weigh many tons. The specifications furnished by the Louisiana Department of Highways required that they be fabricated, assembled and properly fitted in the fabrication shop, then dismantled and transported to the job site where they would be reassembled and installed by the contractor.
“The joint venture made a number of visits and verbal requests as well as written requests to Irby Steel urging faster progress in fabrication of these items and the joint venture in a letter of August 13, 1968 furnished Irby Steel at its request the dates of latest possible delivery of the east and west bascule leaves and the west approach span. These dates were set forth as September 15, 1968 for the east bascule and October 15, 1968 for the west bascule with the delivery of the west approach span to precede the erection of the west bascule.
“The west approach span was not delivered until October 21, 1968, the east bascule was delivered on February 5, 1969 and the west bascule was delivered on March 10, 1969.
“Mr. James Snowden, the project superintendent for the joint venture testified that on October 11, 1968 the joint venture was making excellent progress on the job, had about 150 to 160 men working on the project with sufficient foremen and superintendents to keep the men working efficiently together with all the equipment necessary to perform all necessary items of work concurrently, but that when the east bascule leaf was not delivered, the joint venture was required to lay off some of these men, that the rhythm of the job was lost, and that progress along the path towards completion of the project was completely stopped as the contractor was unable to perform operations concurrently. The joint venture completed the East Pearl River Job on July 11, 1969 and it was accepted on that date by the Louisiana Department of Highways.[1] (Written Reasons for Judgment, Record, pp. 198— 200).
The trial judge then passed upon the various categories of damages claimed by the Joint Venture as a result of the breach by the subcontractor of its contract. The first category of such damages concerns the Joint Venture’s equipment which was forced to remain idle at the jobsite for a certain period of time as a result of the delayed performance by the subcontractor. The trial judge resolved this issue in the following manner:
“During the delay period from October 11, 1968, when the joint venture was ready to receive the remaining three major steel components until the date when it received the first of the bascule leaves on February 5, 1969, the joint venture made a number of complaints and many visits to Irby Steel Company in *237 Gulfport in an effort to speed' delivery. The joint venture is claiming damages for the delay period from October 11, 1968 through February 5, 1969. However, the joint venture in a letter dated January 13, 1969 advised Irby Steel that its equipment was being used until December 20, 1968. In this letter, the joint venture said:
'This means that we are presently holding on standby at the job site and have been holding since December 20, 1968, several large and expensive pieces of construction equipment that we must have on hand to erect the bascule spans and to complete the construction work following behind the erection of the bascule span. This equipment has been steadily employed here at the job site for approximately the past 2 years but now has no other work to do at the job until the bascule spans are delivered for erection. In fact, this equipment has been ready and available for erection of the bas-cule spans since October 11, 1968, the date on which we notified you that progress towards completion was being delayed by your failure to deliver the east bascule leaf. From October 11, 1968 to December 20, 1968, we used this equipment to do work that could have been done simultaneously with the erection and completion of the bas-cule spans.’
“There is no question that Irby Steel was unable to make the delivery dates required by the joint venture. The only question remaining is the extent of damages suffered by the joint venture.
“The joint venture claims that damages for the delay period of October 11, 1968 through February 5, 1969 its losses resulting from idle equipment costs for equipment maintained on the site during the period, which equipment was needed to complete the job. This equipment was described on plaintiff’s in reconvention exhibit no. 47 together with a total of monthly rental rates for the equipment needed on the job for the 3 months and 26 days, which totals amount to the sum of $205,860.92.
“Mr. Snowden testified that the average rental rate for this idle equipment on a monthly basis as set forth on exhibit pr. 47 was determined or arrived at by reference to the rental value of such equipment as set forth in the 1969 20th edition Computation of National Average Rental Rates of the Associated Equipment Distributors. This manual was introduced into evidence by plaintiff in reconvention as pr. exhibit no. 46 subject to the objection of Irby Steel. As to those items on exhibit pr. 47 for which rental values are not set forth in the Associated Distributors Rental Rate Book, Mr. Snowden placed a value based on his knowledge as a contractor with 22 years experience in the use and rental of similar equipment, of the going rental value at the time and in the area. Although there is jurisprudence to the effect that manuals such as the Associated Equipment Distributors rental rate book' are' inadmissible evidence because of the hearsay rule, Mr. Snowden’s testimony along with that of his superintendent was sufficient in the court’s mind to establish these values in computing the amount of damages suffered by the joint venture.
“Irby Steel produced no witness to dispute these average rental values. However it did call a certified public accountant who testified that he examined the books of the joint venture and found that the joint venture failed to list all of the equipment set forth in exhibit pr. 47 on its income tax depreciation schedule for the years in question. The court rejects the idea that depreciation is the only basis of computing the damages of idle equipment loss. It is extremely likely that certain items of equipment would *238 be depreciated on the joint venture’s books yet at the same time have considerable value to the owner. The fact that all the equipment listed on pr. 47 was not set forth on the joint venture’s tax depreciation schedules does not mean that the loss of the use of the equipment during the idle period in question, did not result in damages to its owner, the joint venture, when the equipment was held idle on the job site and was required to complete the job. Irby Steel contends that there was no showing that a market existed for the rental of the equipment or that the joint venture could have used the equipment on another job and for this reason the use of the rental value is not proper in computing damages. There is no question in the court’s mind that most of this equipment was necessary for the joint venture to properly complete the job and the uncertainty of the delivery date caused by the failure of Irby Steel to deliver the steel caused the joint venture to hold this equipment on the job site on a day to day basis although there was no showing that there was a market existing for the rental of the equipment or that the owner could have used the equipment on another job. This equipment was being held for this particular job and the expense of moving the equipment to another job site or finding a market for its rental could have well resulted in a greater loss to the joint venture. The fact that this equipment was on the job site and ready to be used in the completion of the job could well have been a mitigation of damages caused by the delays of Irby Steel in delivering its product to the job. However the court feels that the delay period of 3 months and 26 days cannot all be properly charged in the computation of the damages. The joint venture advised Irby Steel that while the equipment had been available since October 11, 1968 that they, the joint venture, had used this equipment to do work that could have been done simultaneously with the erection and completion of the bascule spans. For that reason the court is going to limit the delay period to the periods beginning December 20th through February Sth, 1969, which is a period of 48 days. Accordingly the court will allow 49ii8ths of the amount claimed by the joint venture or the sum of $83,739.-84.” (Written Reasons for Judgment, Record, pp. 201-203)
Plaintiff assigns as its first specification of error the contention that the award for idle equipment was based on (1) an incorrect finding as to the amount of equipment allegedly idled, (2) an incorrect finding as to the length of time the equipment was allegedly idled, and (3) a legally incorrect computation of the value of the loss of use of such equipment. Conversely, the Joint Venture assigns as its first specification of error the fact that the trial court limited the award for idled equipment to 48 days rather than allowing damages for the 118 days claimed by the Joint Venture. Our review of the record fails to disclose any manifest error committed by the trial judge in concluding that the Joint Venture was entitled to recover for proven equipment idled as a result of the breach of the subcontract by plaintiff for a period of 48 days. The evidence adequately preponderates in favor of the trial judge’s conclusion that the Joint Venture’s equipment was idled as a result of the breach of the subcontract by plaintiff for the period from December 20, 1968, through February 5, 1969. Plaintiff subcontractor’s claim that the damages should be limited to the 22 days of delay damages charged by the State of Louisiana, Department of Highways, to the Joint Venture for overrun does not constitute a proper determination of the damages sustained by the Joint Venture as a result of the breach of the subcontract by plaintiff, with which damages plaintiff is charged as reasonably being within the contemplation of the contracting parties. Similarly, the admission against interest made by the Joint Venture *239 that it had been able to use its equipment up to December 20, 1968, together with the evidence, negates the Joint Venture’s claim that its equipment was idled from October 11, 1968, through February S, 1969, or for the period of 118 days. We discern no manifest error committed by the trial judge in concluding that the Joint Venture failed to prove by the requisite preponderance of the evidence an idled equipment loss for this additional claimed time interval.
We likewise find no merit in plaintiff subcontractor’s complaint that the trial judge erred in using the testimony and documents of the Joint Venture’s Mr. Snowden, a contractor with 22 years’ experience in the use and rental of construction equipment, to compute the idled equipment loss sustained as a result of breach of the subcontract by plaintiff. Plaintiff complains that Mr. Snowden used an equipment rental reference book over plaintiff’s objection, and that such reference book could not be utilized by the court in determining the damages sustained by the Joint Venture because it constituted inadmissible hearsay. A fair appraisal of the evidence taken as a whole, however, satisfies us that the figures used by Mr. Snowden in computing the damages sustained by the Joint Venture constitute competent evidence under the facts of this case, particularly in view of his knowledge and experience in the field and his verification of the reasonableness thereof.
In this connection, we deem the following recent pronouncement by the Louisiana Supreme Court to be apposite:
“Where there is a legal right to recovery but the damages cannot be exactly estimated, the courts have reasonable discretion to assess same based upon all the facts and circumstances of the case. Civil Code Art. 1934(3); Brantley v. Tremont & Gulf Ry. Co., 226 La. 176, 75 So.2d 236 (1954), and decisions therein cited. This latter principle is also applicable, where the fact of loss of earnings or earning power, past or future, is proved, but not any exact amount. Goode v. Hantz, 209 La. 821, 25 So.2d 604 (1946); Clouatre v. Toye Bros. Yellow Cab Co., 193 So.2d 344 (La.App. 4th Cir. 1966), certiorari denied 250 La. 270, 195 So.2d 147 (1967); Hidalgo v. Dupuy, 122 So.2d 639 (La.App. 1st Cir. 1960), certiorari denied.” (Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151, 155 [1971])
We do find merit in plaintiff subcontractor’s contention that the trial judge manifestly erred in his determination of the amount of equipment idled as a result of the subcontractor’s breach. The trial judge accepted the list of equipment which the Joint Venture claimed was idled after certain deletions therefrom were made by the two representatives of the Joint Venture who testified at the trial. This list, however, is in irreconcilable conflict with the earlier admission against interest made by the Joint Venture, represented by the Joint Venture’s January 13, 1969, letter to the subcontractor (Plaintiff in Reconvention Exhibit No. 30) as well as the Joint Venture’s June 5, 1969, letter to the subcontractor (Plaintiff in Reconvention Exhibit No. 40). Counsel for plaintiff subcontractor cogently argues that as of June 5, 1969, there were no other idled equipment costs on the part of the Joint Venture which could develop as by that time all of the work owed by the subcontractor had been delivered. The testimony by the Joint Venture’s Mr. Snowden, as well as the testimony and work diary of the Joint Venture’s job superintendent, Enos Fangue, likewise support only the claim for idled equipment loss as enumerated in the June 5, 1969, letter, and do not support the larger claim made by the Joint Venture in its reconven-tional demand.
• We conclude from our review of the record that the Joint Venture has established its claim for idled equipment loss and dam *240 ages only to the extent of the equipment and its cost on a monthly rental value as follows :
MONTHLY
RENTAL
IDLED EQUIPMENT VALUE
4000 VW Manitowoc Crane — 150 Ton $5,759.00
3900 Manitowoc Crane — 100 Ton 4,082.00
305 Koehring 25 Ton Truck Crane 1,600.00
40' x 175' Spud Barge 1,300.00
35' x 195' Carge Barge 1,100.00
365 C.F.M. Ingersol-Rand Air Compressor 572.00
600 C.F.M. Ingersol-Rand Air Compressor 858.00
3 Pneumatic Controlled Torque Wrenches ($108.00 each) 324.00
Skidmore-Welheim Torque Wrench Calibrator 72.00
30' Twin Diesel Crew Boat 1,050.00
26' Twin Gas Crew Boat 1,050.00
300 H.P. Twin Diesel Tug Boat 1,500.00
26' x 100' Pontoon Barge 450.00
30' x 120' Pontoon Barge 650.00
Total $20,367.00
Dividing this total monthly expense by thirty to arrive at the daily expense, and multiplying the resulting figure by forty-eight, the number of days as correctly determined by the trial court, we arrive at the sum of $32,587.20 as the damages which the Joint Venture is entitled to recover for idled equipment.
The next issue involves the award by the trial court of the sum of $11,709.44 to the Joint Venture as general project overhead attributable to the breach by plaintiff subcontractor. Plaintiff subcontractor complains that the trial judge failed to allocate some of this general project overhead to the West Pearl River Project and to the Hancock County Job, with which these same supervisory personnel of the Joint Venture were allegedly involved and spending some of their time and efforts, but with which two projects plaintiff subcontractor admittedly had no interest or involvement. The Joint Venture complains, conversely, that the trial judge should not have limited this item of damages to 48 days.
The trial judge gave as reasons supporting his award in this regard the following:
“The second major item of damages claimed by the joint venture was general project overhead during the delay period totaling $28,293.61, consisting of salaries for its project engineer, project superintendent, project office manager, project time keeper, payroll taxes and insurance, workmen’s compensation insurance, telephone and utilities, watchmen and patrol services, job site office equipment and direct home office expense. The court believes that these expenses are properly chargeable to Irby Steel for the delays caused by it in delivering the steel. However the court will limit this item of damages to the same period of time as the idle equipment loss outlined above. The amount of loss for 48 days for this item of damages totals the sum of $11,709.44.” (Written Reasons for Judgment, Record, pp. 203, 204)
We find no manifest error committed by the trial judge in reaching his award for this item of damages. The evidence satisfactorily establishes that no appreciable allocation should properly be made of this claimed general project overhead to either the West Pearl River Project or to the Hancock County Job. The West Pearl River Project was virtually completed by December 20, 1968, while there was minimal and negligible work being done by the Joint Venture on the Hancock County Job during the delay period from December 20, 1968, through February 5, 1969. We feel the award made by the trial judge under these circumstances is warranted and not manifestly erroneous. We likewise reject the claim of the Joint Venture that the trial judge’s award of general project overhead was improperly limited to 48 days, for the same reasons previously expressed herein in rejecting the same contention by the Joint Venture regarding the limitation of the idled equipment damage to 48 days.
The next item of damages awarded by the trial court and complained of by plaintiff subcontractor is the damages in the sum of $9,240 representing liquidated damages for demurrage charges assessed by the Louisiana Department of Highways to the Joint Venture for the delay in comple *241 tion of the public project at the rate of $420 per day. In awarding these damages, the trial court stated the following:
“The next item of damages claimed by the joint venture is that of liquidated damages assessed by the Louisiana Department of Highways against the joint venture for 22 contract days in excess of the actual time allowed or excused by the department to complete the project, at the rate of $420 per day totaling $9,-240. Since the 22 days assessed by the Louisiana Department of Highways is well within the 48 day delay period, the court will allow the sum of $9,240 for this item of damage.” (Written Reasons for Judgment, Record, p. 204)
Plaintiff subcontractor contends that the Joint Venture failed to prove that plaintiff was informed by the Joint Venture that the Joint Venture was under a general liability for demurrage charges, and in the absence of proof of such knowledge or notice, the trial judge erred in finding the subcontractor liable therefor. In support of this position, plaintiff subcontractor cites language contained in Frees and Laine v. C. W. Vollmer and Company, 78 So.2d 187 (La.App. Orleans 1955), to the effect that for breach of contract without fraud or bad faith only those damages which were within the contemplation of the parties at the time of the making of the contract may be recovered. While this verbiage was used by the court in the previously cited case, it is significant to note that the subcontractor was, in fact, held liable to the general contractor for the demurrage charges. It is also noted that to the extent that this language purports to reiterate the rule contained in paragraph 1 of Louisiana Civil Code Article 1934 and Article 1943, it is too restrictive, because both of these code articles permit recovery of damages in the situation of a good faith breach not only of those which were in the contemplation of the parties but also those which “may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract” [2] or those which “might have been foreseen at the time of contracting.” [3]
Accordingly, it will be noted that even in the face of a good faith breach of contract, the obligor can properly be held liable for those items of damage of which he reasonably has constructive notice, as well as those of which he has actual knowledge. The record contains ample evidence and the admissions by plaintiff subcontractor confirm its awareness of the general contract and of the plans and specifications, in which the demurrage provision is contained. Moreover, we do not find it unreasonable that plaintiff subcontractor should be charged with notice of the almost universal presence of a liquidated damage clause or demurrage charges in a public works contract such as existed in this case. We find no manifest error committed by the trial judge in making this award of damages to the Joint Venture.
The next specification of error assigned by the Joint Venture is the denial by the trial court of its claim for interest *242 damages at the rate of 7% percent per annum for a period of three months and twenty-six days, equivalent to the period from October 11, 1968, to February 5, 1969, on the sum of $325,000 retained by the Louisiana Department of Highways under the general contract, on the theory that but for the delay occasioned by the subcontractor’s breach, the Joint Venture would have been paid this retainage three months and twenty-six days earlier. This specification of error is without merit, since our review of the record satisfies us that the trial judge committed no manifest error in concluding that there was insufficient evidence to justify this item of damages, inasmuch as there was no showing made that the Louisiana Department of Highways retained this money solely because of the delay caused by the subcontractor.
The Joint Venture also assigns as error the refusal by the trial judge to award it interest damages at the rate of 7% percent per annum on the $325,000 retained by the Louisiana Department of Highways for an additional period of 109 days, during which the Joint Venture claims it was delayed in receiving the retainage due to the filing by the subcontractor of duplicate lien claims in the Mortgage Records of St. Tammany Parish, Louisiana. Again, we find no merit in this assignment of error, and agree that the trial judge committed no manifest error in concluding that the Joint Venture failed to carry the requisite burden of proving that the Louisiana Department of Highways delayed in paying this 10 percent retainage solely because of the breach of the subcontract by plaintiff.
The Joint Venture next complains that the trial judge erred in failing to award it as an item of damages $40,000 representing alleged pro rata home office overhead. We feel the trial judge properly disposed of this claim in the following manner:
“The joint venture claims as a further item of damage a pro rata share of home office overhead in the sum of $40,000 in the delay period of 3 months and 26 days which represented administrative and executive support by members of the companies forming the joint venture in connection with the East Pearl River Project. The court rejects this item of damage on the ground that there is not sufficient proof in the record to justify this award. Mr. Snowden testified that this fee was based upon the efforts of five executives from the member companies of the joint venture who contribute their time and talents to the project at the rate of $2,000 per month each during the delay period of 3 months and 26 days. While the court feels sure that the other executives must have spent some time on this project the only testimony in the record is that of Mr. Snowden who testified that he spent considerable time on the project. . Being one of the owners of the joint venture the court feels that he is not justified in charging this expense as an item of damages on this project.” (Written Reasons for Judgment, Record, p. 205)
The next specification of error urged by the Joint Venture is the refusal by the trial judge to award it as damages its claimed loss of earnings allegedly attributable to the breach by plaintiff subcontractor. Again, we feel the trial judge properly disposed of this claim as follows:
“The joint venture next claims loss of earnings during the delay period in the sum of $342,691.52. The court rejects this item of damage as not being sufficiently proven and being too speculative in nature to arrive at an accurate determination of the loss of earnings.” (Written Reasons for Judgment, Record, pp. 205, 206)
The Joint Venture next assigns as error the refusal by the trial judge to award as an item of damages the cost of three annual lien bond premiums paid by the Joint Venture totaling $4,321.80. This specification of error is likewise without merit, and the trial judge properly concluded that the subcontractor enjoyed the right to file the lien maintain *243 ing its claim for the balance due on the subcontract, and cannot, therefore, be required to pay the lien bond premiums, Miller v. Housing Authority of New Orleans, 175 So.2d 326 (La.App. 4th Cir. 1965). Nothing, other than a business decision, precluded the Joint Venture from paying the admitted balance owed on the subcontract, reserving its rights against the subcontractor for breach thereof and provable damages resulting therefrom. These bond premium expenditures by the Joint Venture all relate to the one lien which the subcontractor had the legal right to file, and are not attributable to the so'-called illegally-filed duplicate lien by the subcontractor.
The remaining allegations of error concern the allowance of interest. Plaintiff subcontractor contends that the trial judge properly awarded it interest on the various sums owed by the Joint Venture to it in accordance with the terms of the various invoices, i. e., net thirty days, inasmuch as these were liquidated sums. Plaintiff subcontractor concedes that the trial court properly awarded the Joint Venture legal interest on the two liquidated offsets owed to the Joint Venture consisting of (1) the sum of $3,800 for the barge rental when that sum became liquidated upon being acknowledged by plaintiff subcontractor as of July 9, 1969, and (2) the $610.54 owed to the Joint Venture by plaintiff subcontractor for straightening handrails beginning thirty days from the date of the invoice therefor. Plaintiff subcontractor further concedes that if the Joint Venture is entitled to judgment against it for the $9,240 demurrage charge assessed to the Joint Venture by the Louisiana Department of Highways, the trial court properly awarded the Joint Venture legal interest thereon, commencing December 23, 1969. Plaintiff subcontractor contends, however, that the Joint Venture should not have been awarded legal interest on the remainder of its claim against plaintiff subcontractor any earlier than from date of the judgment, and that the trial court’s award of legal interest on this sum from date of judicial demand is erroneous, inasmuch as until rendition of judgment this claim was unliquidated.
We think plaintiff subcontractor’s contentions in this regard are well founded in view of the prevailing law and jurisprudence. See, for example, this Court’s pronouncements in Pittman and Matheny v. Davidge, 189 So.2d 706 (La.App. 1st Cir. 1966), writ refused, 249 La. 768, 191 So.2d 143. To the same effect is Quinn Construction Company v. Savoie, 207 So.2d 229 (La.App. 4th Cir. 1968), writ refused, 252 La. 117, 209 So.2d 42. Except for the three items mentioned above, the remainder of the Joint Venture’s claim was unliqui-dated and not readily ascertainable as to quantum until rendition of the judgment. Moreover, inasmuch as the claim of the Joint Venture has been fixed at less than that which the Joint Venture admittedly owed plaintiff subcontractor, it is in the nature of an offset, and constitutes money over which the Joint Venture had possession and control until rendition of the trial court judgment, c. f., Elite Homes, Inc. v. Herrmann, 242 So.2d 614, 619 (La.App. 4th Cir. 1970), writs refused, 257 La. 543, 242 So.2d 884 and 257 La. 984, 244 So.2d 857.
For the foregoing reasons, the judgment appealed from is amended so as to award judgment in favor of plaintiff in recon-vention, W. R. Fairchild Construction Company, Limited, and J. W. Snowden Construction Company, a joint venture, and against defendant in reconvention, Tele-dyne, Inc., successor to Irby Steel Company, in the full sum of $53,536.34, with legal interest at the rate of five percent per annum on $3,800 thereof from July 9, 1969, until paid, with legal interest at the rate of five percent per annum on $610.54 thereof from July 13, 1969, until paid, with legal interest at the rate of five percent per annum on $9,240 thereof from December 23, 1969, until paid and with legal interest at the rate of five percent per annum on the balance thereof in the sum of $39,886.10 *244 from April 20, 1972, the date of rendition and signing- of judgment herein. In all other respects the judgment appealed from is affirmed. All costs of this appeal are assessed to defendant-appellee, W. R. Fair-child Construction Company, Litnited, and J. W. Snowden Company, a joint venture.
Amended and as amended affirmed.

. We do not agree with the trial judge that the evidence jn-eponderatcs in favor of the contention that the work was both completed by the Joint Venture and accepted by the Louisiana Department of Highways on July 11, 1969. When the Joint Venture’s Mr. Snowden was asked this two-pronged question, he qualified his answer and testified only that the work was completed by the Joint Venture on July 11, 1969. (Record, p. 339) He did not confirm that the work was likewise accepted by the Louisiana Department of Highways on that date.

. Louisiana Civil Code Article 1934, the pertinent part of which reads as follows:
“Where the object of the contract is anything but the payment of money, tlie damages due to the creditor for its breach are the amount of the loss he lias sustained, and the profit of which he has been deprived, under the following exceptions and modifications:
“1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the eon-temptation, of the parties at the time of the contract. * * * ” (Emphasis supplied by the Court.)

. Louisiana Civil Code Article 1943, which l>rovides as follows:
“The debtor is liable only to such damages ns were foreseen, or might have been foreseen at the time of contracting, when it is not owing to his fraud that the obligation has not been executed.” (Emphasis supplied by the Court.)