282 So.2d 546 (1973)
Donald Ray SPILLERS
v.
MONTGOMERY WARD & CO., INC., et al.
No. 12101.
Court of Appeal of Louisiana, Second Circuit.
June 28, 1973.
Rehearing Denied September 11, 1973.
Writs Granted November 9, 1973.
*547 Booth, Lockard, Jack, Pleasant & LeSage by Troy E. Bain, Shreveport, for plaintiff-appellant-appellee Donald Ray Spillers.
Hudson, Potts & Bernstein by Jesse D. McDonald, Monroe, for defendant-appellant Montgomery Ward & Co., Inc.
Wilkinson, Carmody & Peatross by John M. Madison, Jr., Shreveport, for defendants-appellants G & S Manufacturing Co. and Truck Ins. Exchange.
Theus, Grisham, Davis & Leigh by R. L. Davis, Jr., Monroe, for defendants-appellees Reliable Motors, Inc. and American Employers Ins. Co.
Before AYRES, HEARD and HALL, JJ.
En Banc. Rehearing Denied September 11, 1973.
HALL, Judge.
Plaintiff, Donald Ray Spillers, purchased a used truck from Reliable Motors, Inc. To meet plaintiff's requirements, Reliable had the truck outfitted by G & S Manufacturing Co., Inc. for use in hauling pulpwood. Among the equipment furnished and installed by G & S was a used tag axle with "split rim" wheels. The next day after purchasing the truck, plaintiff took it to Montgomery Ward & Co., Inc. to have tires mounted on the tag axle wheels. A Montgomery Ward employee mounted a tire on one of the wheels, inflated the tire *548 and rolled the wheel to the side of the truck for mounting on the truck. The wheel "exploded" and one of the rims struck plaintiff who was standing nearby, injuring his left leg and right knee.
Plaintiff filed suit for damages against (1) G & S and its liability insurer, Truck Insurance Exchange; (2) Reliable and its liability insurer, American Employers Insurance Company; and (3) Montgomery Ward & Co., Inc. All defendants answered denying liability. After trial a jury returned a verdict in favor of plaintiff for $85,000 against G & S and its insurer, and Montgomery Ward. From a judgment rendered in accordance with the jury's verdict, G & S, its insurer, and Montgomery Ward appealed. Plaintiff also appealed from the judgment insofar as it rejected his demands against Reliable. We amend the judgment to reduce the amount awarded and affirm the judgment in all other respects.
In April, 1970, plaintiff was preparing to go into the pulpwood business. He went to Reliable Motors in Ruston to see about buying a used truck. J. D. Caver, a salesman for Reliable, showed plaintiff a 1968 Ford truck which, however, did not have the specialized equipment needed for loading and hauling pulpwood. Caver took plaintiff to Dubach and showed him a similar truck which had been equipped for hauling pulpwood. Plaintiff then signed a purchase order agreeing to purchase the 1968 Ford truck, to be equipped with a heavy duty frame, G & S wood frame and loader, heavy duty bumper and wrap up, tool box, head rack, grill screen, grabs and tag axle with wheels.
Reliable delivered the truck to G & S in Hope, Arkansas, for installation of the equipment. G & S outfits approximately twenty trucks per month with pulpwood loading equipment and accessories manufactured by it from raw materials. On occasion, perhaps once a month or less, at a customer's request, G & S also furnishes and installs tag axles and wheels, purchased used by G & S from salvage dealers. All of the equipment installed on the 1968 Ford truck in this instance was newly manufactured by G & S, except the tag axle and wheels which were used.
The tag axle and wheels furnished in this instance were purchased from a salvage yard. The evidence is not clear as to whether these items were purchased at about the same time the truck was outfitted, or whether they were purchased some two years previously and used in the meantime on another truck. In any event, at some point in time G & S purchased the axle and wheels from a salvage yard.
After purchase from the salvage yard the axle required some modification and attachment to the truck. The wheels were visually inspected for breaks and cracks, were wire-brushed to get the rust off, and were sprayed with black paint to make them look better and to match the new equipment in appearance.
Reliable was aware from the beginning that the tag axle and wheels were to be used equipment and plaintiff was made aware of this at the time he took delivery of the truck, if not previously.
The wheels were placed in the tool box on top of the truck. The truck was driven back to Reliable in Ruston. The only inspection made by Reliable was that its salesman, Caver, walked around the truck and looked at it and looked into the tool box to see that the wheels were there.
Plaintiff took delivery of the truck and paid for it on April 24. The next day he drove the truck to Montgomery Ward in Monroe to have tires put on the four wheels of the tag axle. A Montgomery Ward employee, Alfred Robertson, mounted tires on the wheels. He rolled one of the wheels, with the inflated tire, to the side of the truck, at which point the two rims of the wheel separated violently, causing the injury to plaintiff standing nearby.
The wheel in question was manufactured in 1954. It is a split rim wheel, composed *549 of two rims. The larger rim is called a base rim and the smaller rim is called a side rim. Both rims have locking rings or beads, which are raised portions of the rims which fit together and are designed to keep the rims from separating.
After the accident, the locking bead of the base rim appeared to be in relatively good condition. The locking bead of the side rim appeared to be in very bad conditionbadly rusted, corroded, pitted and broken. It is perfectly obvious that the rim separated under pressure from the inflated tire because of the defective condition of the locking bead of the side rim.
The key factual dispute in this case, bearing particularly on the liability of Montgomery Ward, is the condition and appearance of the defective rim prior to the accident. The jury's finding of liability on the part of Montgomery Ward necessarily implies a finding by the jury that the appearance of the rim was such that Montgomery Ward's employee could and should have determined on reasonable inspection that the rim was in bad condition and unsafe for mounting. Although Montgomery Ward offered evidence to the contrary, there is substantial evidence to support the jury's finding, which we do not find to be manifestly erroneous.
The wheel itself is in evidence. As previously mentioned, the locking bead on the side rim is badly rusted, corroded, pitted and broken. The two rims can be fitted together with a minimum push of the hand against the rims because of the reduced size of the locking bead of the side rim. Under normal conditions, the rim must be fitted together by use of a hammer applied with considerable force.
Dr. William Tonn, a well-qualified consulting engineer with considerable experience in metals, testified for plaintiff. He examined the wheel several months after the accident. He found that the locking bead on the small rim had corroded down to a point where the overlap of the locking beads of the two rims was insufficient to hold them together under pressure from the inflated tire. Measurements taken by him verified the reduced overlap. He was of the opinion the explosion itself could not have deformed the metal of the locking bead to any significant extentnot to the extent of its defective appearance after the accident. Thus, he was of the opinion the corroded condition, particularly the pitting of the locking bead could have been determined on inspection prior to the accident.
On this key factual issue, Montgomery Ward relies primarily on the testimony of its employee, Robertson, and its expert witness Laurence Keltner. Robertson testified he inspected the rim before mounting, visually and by running his fingers around the bead, and it appeared to be in good conditionlike many other rims mounted by him. He testified he had to hammer the rims together in the ordinary manner.
The well-qualified expert, Keltner, worked for a major tire manufacturer for forty-three years in important capacities and is now an independent consultant on tires and rims. He examined the rim shortly after the accident. He found bright areas around the locking bead which indicated to him that a substantial part of the locking bead gave way at the time of the explosion. Based on this finding, and Robertson's testimony that the bead appeared to be in good condition prior to the accident, Keltner was of the opinion the bead was weak from corrosion and rust and gave way under the hammering and the pressure exerted by the inflated tire. Keltner concluded that prior to the accident there was sufficient metal on the locking bead to provide good contact and the weakened condition of the rim would not have been apparent on reasonable inspection by the tire mounter, particularly with the black spray paint covering the rim.
Keltner's opinion is based to a great extent on the accuracy and credibility of Robertson's testimony. Tonn's opinion is supported substantially by the appearance *550 of the rim itself and his experience with metals. Our conclusion is that the evidence favors plaintiff's contentions and supports a finding that the appearance of the rim prior to the explosion was such that its defective condition should have been discovered by the experienced tiremounter on reasonable inspection.
Liability of G & S
A manufacturer's responsibility for defective products is defined in Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971):
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
"See: Penn v. Inferno Manufacturing Co., 199 So.2d 210 (La.App. 1st Cir. 1967), cert, denied 251 La. 27, 202 So.2d 649 (1967); Arnold v. United States Rubber Co., 199 [203] So.2d 210 [764] (La.App. 1st Cir. 1967), cert, denied 251 La. [738] 739, 206 So.2d 91 (1968); Meche v. Farmers Drier & Storage Co., 193 So.2d 807 (La.App. 3d Cir. 1967), cert. denied 250 La. 369, 195 So.2d 644 (1967); Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4th Cir. 1962); Percy, Products Liability, 40 Tul.L.Rev. 715 (1967); Note, 26 La.L. Rev. 447 (1966). See also: Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 13 A. L.R.3d 1049 (1963), Noted, 23 La.L.Rev. 810 (1963); Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69 (1960); Annotation, Products Liability, 13 A.L. R.3d 1957 (1967).
"If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.
"See: Radalec, Incorporated v. Automatic Firing Corp., 228 La. 116, 81 So.2d 830 (1955); Tuminello v. Mawby, 220 La. 733, 57 So.2d 666 (1952); Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906, 40 L.R.A.,N.S., 480 (1911); George v. Shreveport Cotton Oil Co., 114 La. 498, 38 So. 432 (1905); Penn v. Inferno Mfg. Co., 199 So.2d 210, 230 (La.App. 1st Cir. 1967), cert, denied 251 La. 27, 202 So.2d 649 (1967)."
G & S argues that it did not manufacture the tag axle and wheels and that its responsibility is only that of a seller of used articles. Our holding is to the contrary. G & S held itself out as a manufacturer of pulpwood loading equipment and accessories, and did in fact manufacture most of the equipment installed on the truck purchased by plaintiff. The tag axle and wheels, although known to be used by all concerned, were part of a package of equipment furnished and installed by G & S. It is not essential that every item of a unit of equipment be actually manufactured from raw materials by the manufacturer in order for liability to attach under the principles set forth above. See Penn v. Inferno Manufacturing Corporation, 199 So.2d 210 (La.App. 1st Cir. 1967). Additionally, G & S did perform some modifications to the axle and wheels.
We hold that G & S is in the position of a manufacturer, that its product was defective, that the defect in the product caused plaintiff's injury, and G & S is liable for the resulting damages.
*551 Even though it is not necessary to establish actual negligence on the part of a manufacturer, the evidence in this case supports a finding that G & S was negligent. A careful, reasonable inspection of the wheel would have disclosed its defective condition. G & S was negligent in failing to adequately inspect the wheel and in failing to discover the defect.
Liability of Reliable
The duty of a dealer in secondhand vehicles who undertakes to recondition a vehicle is spelled out in Barker v. Phoenix Insurance Company, 220 So.2d 720 (La.App. 2d Cir. 1969):
"While a dealer in used or secondhand motor vehicles who undertakes to recondition a vehicle for resale is not an insurer of the safety thereof, he is nevertheless under a duty to use reasonable care in making tests for defects which would render the vehicle a menace to persons using or coming into contact with it and making it reasonably safe for use on the highways. He is charged with the knowledge of patent defects or defects which are discoverable in the exercise of ordinary care. Blashfield Cyclopedia of Automobile Law and Practice, Vol. 7A, page 204 § 4812. See, also, 78 A.L.R.2d 484, § 5(a)."
In Cain v. Rapides Dodge, Inc., 207 So. 2d 918 (La.App. 3d Cir. 1968), the court held:
"The applicable law is found in Article 2531 of the Civil Code, which provides in part: `The seller who knew not the vices of the thing, is only bound to restore the price, and to reimburse the expenses occasioned by the sale * * *.' Civil Code Article 2545 provides that if the seller knew the vice of the thing and did not declare it, he is also liable for any damages resulting to the buyer as a result of the defects. As regards retail dealers of automobiles, etc., the jurisprudence has construed the above articles to mean that if the defects in the automobile are such as would not be observed by the ordinary dealer without taking the car apart and minutely inspecting it, the dealer is liable only for the return of the purchase price plus the expenses of the sale."
The jury was charged in accordance with the principles of law set forth above and found for Reliable.
Reliable's salesman made only a minimal inspection, but it was consistent with the duty of ordinary care in the discovery of patent defects expected of a retail dealer of vehicles. Reliable did not itself undertake to recondition or repair the vehicle as was the situation in the Barker case. It did not have the duty of making tests or minute inspections of the various equipment installed by a reputable manufacturer. While the defect in the locking bead of the side rim of one of the wheels should have been apparent to one with a trained eye dealing specifically with that part, the defect was not such as would be discoverable by a dealer making an ordinary inspection for patent defects.
We find no negligence or breach of duty on the part of Reliable. The jury correctly rejected plaintiff's demands against that defendant.
Liability of Montgomery Ward
The duty of a servicer of motor vehicles is stated in Foy v. Ed Taussig, Inc., 220 So.2d 229 (La.App. 3d Cir. 1969) as follows:
"The general rule is that recovery may be had against a repairman for personal injuries sustained after the making of repairs to a motor vehicle, if the evidence establishes that the repairman was negligent in making the repairs, that there was a causal relationship between the negligent repair work and the subsequent accident, and that the negligence of the repairman was a proximate cause of the accident ..."
*552 The legal duty of Montgomery Ward in connection with its activities in its automobile center relating to the repair and servicing of motor vehicles, including tire mounting, is to use reasonable care in making repairs or doing other work on vehicles. Liability will attach if the evidence establishes the employee who mounted the tire was negligent in doing the work and such negligence was a legal cause of plaintiff's injury.
The Montgomery Ward employee acknowledged the dangerous nature of split rim wheels and the evidence shows the company's tire mounters were instructed to inspect the rims prior to mounting a tire. The policy was to decline to mount a tire if the rim was defective. As previously stated, we find as a fact that the defective condition of the rim should have been discovered on reasonable inspection by one with experience in dealing with split rim wheels. Thus, it was negligence for Montgomery Ward's employee to fail to discover the defective condition of the rim and to mount the tire on the defective rim.
This negligence was a contributing legal cause of the accident and plaintiff's resulting injury and Montgomery Ward is liable for plaintiff's damages.
Quantum
Finally, we come to the issue of quantum. The jury awarded $85,000 damages.
According to Dr. Roy H. Ledbetter, an orthopedic surgeon who treated plaintiff, the main injuries consisted of a fracture of the lower part of the left leg which included both bones, the fracture of the larger bone, or tibia, being comminuted. In addition, plaintiff had a two inch laceration on the outer side of the right knee and contusions on the right ankle.
Dr. Ledbetter testified the injuries to the left leg necessitated surgery to realign the bones and application of a plaster cast extending from plaintiff's toes to his groin which he wore for five months. After removal of the plaster cast plaintiff had to remain on crutches for approximately a month. The leg was still not weight-bearing at that time so in January, 1971, plaintiff was fitted with a leg brace which he wore for about five months. Dr. Ledbetter further stated that the plaintiff's left leg did eventually heal properly with only a small residual permanent limitation of motion of approximately fifteen per cent of the leg.
In September, 1972, plaintiff informed Dr. Ledbetter he was having considerable difficulty with his right knee "locking" on him. Upon examination Dr. Ledbetter found a loose bone chip in the right knee joint and although the exact origin of the chip could not be determined Dr. Ledbetter testified he believed it was related to the blow to the right knee in the original accident. Dr. Ledbetter further stated that corrective surgery would be necessary to remove this loose fragment of bone. Plaintiff's previous medical history coupled with the testimony of Dr. Ledbetter convinces us that this injury was also related to the accident in question.
This court is fully cognizant of the general principal that to modify the amount of an award for damages, an appellate court must find that the trial judge or jury has abused the "much discretion" allowed the trier of fact. It is our opinion that the jury's award of $85,000 in this case was excessive and amounted to an abuse of discretion.
We find that an award of $15,000 for plaintiff's pain and suffering and permanent disability would be proper under the circumstances presented in this case.
In reference to plaintiffs' special damages a review of the record shows $3,635.36 to be a proper award for plaintiff's medical and doctor's expenses past and future.
Plaintiff's claim for loss of wages poses a difficult question for the court. *553 Plaintiff had made arrangements with a friend, Everett Pesnell, to go into the pulpwood hauling business on a 50/50 basis. He had purchased a truck from Reliable Motors for $5,450 and had it equipped for this specific purpose. He had arranged for a crew. However, before he was able to actually pursue this undertaking the accident in question occurred. Everett Pesnell went ahead on his own and the record reflects he earned approximately $1,800 a month for the year 1970. The trial judge would not allow the plaintiff to introduce evidence of Pesnell's earnings in the business venture. However, we find this evidence to be very relevant and indicative of exactly how plaintiff's earning capacity was damaged as a result of this accident.
The evidence shows that plaintiff was an industrious, healthy young man prior to the accident. His income tax returns for the year 1969 show a loss of income from part-time barber and bulldozer businesses, but the evidence also shows that plaintiff personally contracted and built his own home during 1969 at a savings of approximately $10,000. Plaintiff was engaged in productive work during that year which was a benefit to him financially although his business undertakings were not showing a profit.
Plaintiff suffered an impairment of his earning capacity during the period of his incapacitation. He was in the process of entering into an equal partnership with Mr. Pesnell in the pulpwood-hauling business and was prevented from doing so by the accident in question. Pesnell went ahead with their original plans on his own and showed a substantial profit for 1970. It would be logical and reasonable to assume that except for the accident in question the plaintiff would have earned at least half of the amount of profits made by Pesnell as he was to share in the profits of the enterprise on a 50/50 basis.
Plaintiff is entitled to recover damages for the impairment of his earning capacity although these damages cannot be estimated precisely. The Louisiana Supreme Court has enunciated the proper approach to be followed in Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971). The court held:
"In denying an award both for the loss of earnings between the accident and the trial and also for future loss of earnings after the trial, the court of appeal held that such loss was not proven with reasonable certainty. Essentially, any award at all was denied for this loss (as to which he, his wife, and his employer testified) because of his failure to prove it by corroborative evidence such as income tax returns or employment records.
"In denying this award, the court of appeal sought to apply a line of jurisprudence developed by the intermediate courts to the effect that an uncorroborated general estimate by a plaintiff as to his loss of earnings may not constitute sufficient proof of such loss, where corroborative evidence is shown to be available but is not produced. The court relied upon Stevens v. Dowden, 125 So.2d 234 (La.App. 3d Cir. 1960) and decisions therein summarized.
"The cited decision itself demonstrates, however, that the principle does not provide a mechanical rule denying any recovery, whenever a plaintiff's own testimony as to his loss of earnings is not corroborated by records. There, the plaintiff's own detailed testimony was accepted as sufficiently proving his loss of earnings during a period of disability.
"Other intermediate decisions likewise hold, correctly, that a claim for loss of earnings need not be proved with mathematical certainty, but only by such proof as reasonably establishes the claim. This may even consist only of the plaintiff's own reasonable testimony, if accepted as truthful; although of course corroborating testimony. See, e. g.: Charles v. Phoenix Insurance Co., 229 So.2d 467 (La.App. 3d Cir. 1969); Hughes v. New *554 Orleans Public Service, Inc., 221 So.2d 331 (La.App. 4th Cir. 1969); Clouatre v. Toye Bros. Yellow Cab Co., 193 So.2d 344 (La.App. 4th Cir. 1966); Colton v. Hartford Fire Ins. Co., 135 So.2d 489 (La.App. 2d Cir. 1961).
"There are, however, other intermediate decisions, similar to the present, which disallow any award for loss of earnings in the absence of records corroborating the plaintiff's testimony. These decisions seem to indicate that such testimony, no matter how unsuspicious nor how consistent with proven disability, can never by itself prove an earningsloss with reasonable certainty. See, e. g.: Craig v. Burch, 228 So.2d 723 (La. App. 1st Cir. 1969); Radecker v. Phillips, 223 So.2d 468 (La.App. 4th Cir. 1969); Smith v. Brekeen, 216 So.2d 90 (La.App. 1st Cir. 1968).
"In requiring this artificial prerequisite for recovery for loss of earnings, the courts so holding overlook fundamental general principles regulating the burden of proof and the award of damages in tort cases.
"One injured through the fault of another is entitled to full indemnification for the damages caused thereby. La. Civil Code Art. 2315. Another general principle deduced therefrom and applicable here may be stated as follows:
"Where there is a legal right to recovery but the damages cannot be exactly estimated, the courts have reasonable discretion to assess same based upon all the facts and circumstances of the case. Civil Code Art. 1934(3); Brantley v. Tremont & Gulf Ry. Co., 226 La. 176, 75 So.2d 236 (1954), and decisions therein cited. This latter principle is also applicable, where the fact of loss of earnings or earning power, past or future, is proved, but not any exact amount. Goode v. Hantz, 209 La. 821, 25 So.2d 604 (1946); Clouatre v. Toye Bros. Yellow Cab Co., 193 So.2d 344 (La.App. 4th Cir. 1966), certiorari denied 250 La. 270, 195 So.2d 147 (1967); Hidalgo v. Dupuy, 122 So.2d 639 (La.App. 1st Cir. 1960), certiorari denied."
Also see, Irby Steel v. W. R. Fairchild Construction Company, Ltd., 270 So.2d 233 (La.App. 1st Cir. 1972); Otillio v. Scopes, 265 So.2d 319 (La.App. 4th Cir. 1972); Riley v. Frantz, 253 So.2d 237 (La.App. 4th Cir. 1971).
In light of the cited jurisprudence and the evidence, we believe an award of $10,000 for loss of earnings is appropriate in the present litigation.
Therefore, for the reasons assigned, the judgment of the district court is amended to reduce the amount of the award to $28,635.36 and, as amended, is affirmed.
Amended, and as amended, affirmed.