**FIRST COMMONWEALTH CORPORATION**

v.

**HIBERNIA NATIONAL BANK OF NEW ORLEANS.**

Civ. A. No. 91–2743.

United States District Court, E.D. Louisiana.

July 26, 1994.

John C. Combe, Jr., Warren M. Schultz, Jr., M. Richard Schroeder, T. Michael Twomey, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for First Com. Corp.

Robert Stephen Rooth, Corinne Ann Morrison, James Calvin Young, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, John F. Weeks, II, Usry & Weeks, Metairie, LA, for Hibernia Nat. Bank of New Orleans.

Robert G. Stassi, Chehardy, Sherman, Ellis, Breslin & Murray, Metairie, LA, Frank Gerald DeSalvo, Frank G. DeSalvo, New Orleans, LA, for Leonard H. Aucoin and W. Joel Herron.

Richard Terrell Simmons, Jr., Kurt D. Engelhardt, Hailey, McNamara, Hall, Larmann & Papale, Metairie, LA, for Dennis J. LaFont.

Laurence D. Rudman, Pierre V. Miller, II, Kiefer & Rudman, APLC, Metairie, LA, for Jerry F. Palmer.

Jerry F. Palmer, pro se.

## *MEMORANDUM AND ORDER*

SEAR, Chief Judge.

Plaintiff First Commonwealth Corporation ("FCC") invokes the court's diversity jurisdiction[1] to file this breach of contract claim against defendant, the Hibernia National Bank of New Orleans ("Hibernia").[2]

---

1. 28 U.S.C. § 1332.

2. *See* Complaint at ¶¶ XXII–XXIV.

I) Background

This action arises out of a financial arrangement between FCC and Public Investors, Inc. ("PII").

A) Stock Purchase Agreement

On December 11, 1989, FCC and PII closed on a "Stock Purchase Agreement" (the "Agreement"), whereby FCC agreed to purchase from PII substantially all of the issued and outstanding common stock of Universal Guaranty Life Insurance Company ("Universal") and Alliance Life Insurance Company ("Alliance") for $36.25 million. *See* Defendant's Statement of Undisputed Material Facts at ¶ 1. Of the total purchase price, FCC paid $26.25 million in cash and issued a promissory note (the "FCC note") to PII for the remaining $10 million. *See* Stock Purchase Agreement, Plaintiff's Exhibit 2, at ¶ 3. Pursuant to the Agreement, FCC loaned $8.25 million to Insurance Premium Assistance Company ("IPAC"), another affiliate of PII ("IPAC Note"). *See* Stock Purchase Agreement at ¶ 12(k).

At the time the Agreement was entered into, Universal had an outstanding loan of approximately $3.3 million to Fidelity Fire and Casualty Insurance Company, ("Fidelity Fire"), an affiliate of PII,[3] and Alliance had an outstanding unsecured loan of $750,000 to PII.[4]

According to the express terms of the Agreement, FCC had "a right of set off against the indebtedness owing" on the FCC note "for any amounts not paid when due on the loans made to" IPAC, PII or Fidelity Fire by FCC or its affiliates.[5] *See* Stock

Purchase Agreement at p. 46 at ¶ 12(p); Plaintiff's Memorandum in Opposition at 3; Defendant's Memorandum in Support at 13.

B) IPAC Financing Agreement and Custodian Agreement

The terms of FCC's loan to IPAC, as set forth in the "Term Loan and Security Agreement" ("IPAC Financing Agreement"), required IPAC to pledge and maintain as collateral a pool of approximately $9.2 million worth of "premium finance notes."[6] Because the notes decreased in value monthly, IPAC was required to periodically replenish the collateral. *See* IPAC Financing Agreement at ¶ 5(c)–(d).[7]

Accordingly, on December 11, 1989, FCC and IPAC entered into a written "Custodian Agreement" with Hibernia, in which Hibernia agreed to receive, catalog and store the premium finance notes and to account for all notes delivered into and withdrawn from its custody. *See* Defendant's Statement of Undisputed Material Facts at 12. Hibernia was further obligated to forward to FCC certain documents furnished by IPAC which essentially indicated that old notes had been withdrawn and new notes deposited. *See* Defendant's Statement of Undisputed Material Facts at ¶ 14–16.

In March 1990, however, IPAC stopped delivering premium finance notes to Hibernia. It defaulted on its payment obligations to FCC in July 1990. By the time FCC seized the premium finance notes in September 1990, they had decreased in value to approximately $1,171,539.[8] *See* Defendant's

---

3. *See* Plaintiff's Memorandum in Opposition at pp. 2–3.

4. *See Id.* at p. 3.

5. For example, if IPAC defaulted on its loan from FCC and the value of the collateral was not worth the amount of the default, First Commonwealth could subtract the difference from any amount it owed on the FCC note to cover any loss it suffered. *See* Plaintiff's Memorandum in Opposition at 3–4.

6. The premium finance notes represented loans made to consumers by IPAC to finance automobile insurance premiums on policies issued by Fidelity Fire. The insureds in turn made monthly payments to IPAC.

7. IPAC was to replenish the collateral by depositing new premium finance notes as the old notes reduced in value, were paid off or when the insurance policies underlying them were canceled.

8. FCC contends that either it or its affiliates were owed approximately $14.635 million. IPAC and Fidelity Fire owed approximately $8.6 million and $3.5 million respectively on their loans. PII owed $750,000 on the Alliance loan and $1.785 million on certain breach of warranty claims asserted by FCC. *See* Plaintiff's Memorandum in Opposition at 10–11.

**1148**

Statement of Undisputed Material Facts at ¶ 21; Plaintiff's Memorandum in Opposition at 5–6.

In February 1991, after pursuing its available legal remedies FCC entered into a "Compromise and Settlement Agreement" (the "Compromise") with PII and its affiliates. *See* Plaintiff's Memorandum in Opposition at 12. Under the terms of this Compromise, FCC, among other things, applied the approximately $1.2 million recovered on the premium finance notes to satisfy a portion of the IPAC note. FCC then used its right of set-off against the FCC note to satisfy the remainder of the IPAC note and other claims, including claims for breach of warranty, it and its affiliates had against IPAC and its affiliates.

Despite the Compromise, however, the $3.3 million remaining on the Fidelity Fire Note and $970,000 of FCC's warranty claims, among other claims against PII and its affiliates, were still outstanding.[9] *See* Plaintiff's Memorandum in Opposition at 12–13.

### C) The Present Suit

FCC then filed the present suit claiming that Hibernia breached the Custodian Agreement, thereby causing a collateral deficiency for FCC. FCC contends that had Hibernia not breached its obligation, there would have been enough collateral and/or "set off" funds available to cover all of the obligations of PII and its affiliates.

Specifically, FCC seeks damages on the outstanding indebtedness on the Fidelity Fire loan and the warranty claims less the value of the remaining collateral. *Id.* FCC also seeks to recover the legal expenses it incurred during its 1990 litigation against PII, IPAC and Fidelity Fire and the fees incurred while attempting to replace an alleged cash shortfall it suffered because of the defaults. *Id.* Finally, FCC seeks the $64,-400 in custodial fees paid to Hibernia and the interest that has subsequently accrued on the Fidelity Fire loan. *Id.*

Hibernia has now filed a motion for summary judgment claiming that FCC has suffered no recoverable damages.

### II) Discussion

■■■ Rule 56(c) of the Federal Rules of Civil Procedure requires the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement is that "there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). A fact is "material" if proof of its existence or non-existence would affect the outcome of the lawsuit under the law applicable to the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15.

■ Once the movant has satisfied its burden by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of its claim or by affirmatively negating an essential element of the non-moving party's case, the non-moving party is then required to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories, etc., to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

At issue in this motion is whether Hibernia is liable for any of the damages allegedly suffered by FCC.

■■■ Under Louisiana law, Hibernia, a good faith obligor,[10] is liable for those damages caused by its breach that were foreseeable at the time the Custodian Contract was

---

9. Against these obligations, FCC contends that it held only the collateral on the Fidelity Fire note worth approximately $1.2 million.

10. FCC has not contended that Hibernia acted in bad faith.

made. La.Civ.Code arts. 1994, 1996. Foreseeable damages are those that would be within the reasonable foresight of a reasonable man. La.Civ.Code art. 1996, Commentary (b). In distinguishing between foreseeable and unforeseeable damages a court should consider "the nature of the contract, the nature of the parties' business, their prior dealings, and all other circumstances related to the contract and known to the obligor." *Id.* Moreover, a good faith obligor may be held liable for those items of damage of which he may reasonably be said to have actual or constructive knowledge. *Irby Steel v. W.R. Fairchild Constr. Co. Ltd.*, 270 So.2d 233, 241 (La.App. 1 Cir.1972).

■ Hibernia attempts to satisfy its burden on summary judgment through a series of unsupported allegations. *See* Hibernia's Memorandum in Support of Motion for Summary Judgment at 23–26. Hibernia contends that in no way could it have contemplated that a breach of the Custodian Agreement on its part could cause either losses on loans Hibernia knew nothing about or losses caused by breaches of warranties of which Hibernia had no knowledge.[11] Although it appears that FCC's claims hang by a slender reed, Hibernia's mere allegations, without more, are insufficient to discharge the burden placed upon it by the federal rules. *See Willis v. Roche Biomedical Laboratories, Inc.*, 21 F.3d 1368, 1374 (5th Cir.1994) *quoting Celotex*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (White, J. concurring). Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment is DENIED.

---

11. Hibernia alleges that FCC has admitted that Hibernia did not receive a copy of the Agreement. *See* Hibernia's Memorandum in Support of its Motion for Summary Judgment at 23. It, however, provides no support for this assertion. Moreover, Hibernia fails to list this fact in the Statement of Uncontested Material Facts which accompanies the Motion for Summary Judgment.